Green v. Graves.

GREEN, RECEIVER OF THE BANK OF NILES *v.* GRAVES.

So much of the "Act to organize and regulate banking associations," (S. L. 1837, p. 76,) as purports to confer corporate rights upon the associations organized under its provisions, is in violation of the second section of the twelfth article of the constitution of this state, which declares that "The Legislature shall pass no act of incorporation, unless with the assent of at least two-thirds of each house," and is, therefore, void.

CASE certified from St. Joseph Circuit Court.   Assumpsit upon a promissory note made by the defendant, for the sum of $100, dated the 22d day of July, 1838, and payable to the Bank of Niles.   The declaration set forth the note, and averred that the Bank of Niles was an institution organized under the act to organize and regulate banking associations, approved March 15th, 1837, and that, on the 14th day of September, 1839, the plaintiff was duly appointed by the Chancellor, Receiver of the property and effects of that institution.   The defendant demurred generally to the declaration; insisting, as the sole ground of the demurrer, that the Bank never had any legal existence, the act under which it was organized being unconstitutional and void.

*T. Romeyn,* in support of the demurrer.

*Green & Dana,* contra.

WHIPPLE, J. delivered the opinion of the Court.

In support of the demurrer, it is insisted that the act to organize and regulate banking associations, under which the Bank of Niles was organized, is repugnant both to the letter and to the spirit of the second section of the twelfth article of the constitution of this state, which provides, that " The Legislature shall pass no act of incorporation, unless with the assent of at least two-thirds of each house."

The authority of this Court, to declare laws which are passed in violation of the constitution, void and inoperative, cannot be questioned. The duty to do so, when a proper case is presented, is imposed upon us by the constitution, and by our oaths of office. We feel bound to consider and decide questions of this nature with great deliberation, but at the same time with great firmness. And it may be proper here to remark, that we adhere to the rule sanctioned by the Supreme Court of the United States, and adopted by this Court, the wisdom and propriety of which is unquestionable, that, to authorize the judiciary to pronounce a law unconstitutional, the conflict between the constitution and the law must be apparent and palpable ; an infraction of the provisions of the former must be established beyond all reasonable doubt ; otherwise the law must be sustained. Considerations of mere expediency can never legitimately enter into the discussion of questions involving the constitutionality of a law. The only question that can be considered is one of *power.*

A brief analysis of the " act to organize and regulate banking associations," is necessary to the right understanding of the question presented for our consideration.

The first section provides that, " whenever any persons resident in any of the counties of this state shall be desi-

rous of forming an association for transacting banking business, such persons shall make a written application to the treasurer and clerk of the county where such business is proposed to be transacted ; which application shall set forth the amount of the capital proposed to be used by such association, and the place proposed to locate the office for the transaction of the business of said association : and on application made as aforesaid, by at least twelve freeholders, resident of any such county, it shall be the duty of any such treasurer and clerk to cause public notice thereof to be given, at least thirty days, in some public newspaper published in such county," &c. " which notice shall set forth the amount of capital proposed to be used by such association, and designate the time and place of opening books to the capital stock thereof."

The third section prescribes that the capital stock of such associations shall not be less than fifty thousand dollars, nor more than three hundred thousand dollars.

The fourth, fifth, sixth, and seventh sections relate to the manner of opening the books of subscription, the distribution of the stock, the election of officers, &c.

The ninth section provides that " all such persons as shall become stockholders of any such association, shall, on compliance with the provisions of this act, constitute a body politic and corporate, in fact and in name, and by such name as they shall designate and assume to themselves, which name shall not be changed without the consent of the legislature; and by such name they and their successors shall and may have continual succession, and shall in their corporate capacity be capable of suing and being sued, pleading and being impleaded, answering and being answered unto, defending and being defended, in all courts and places whatsoever; and that they and their successors may have a common seal, and that they and their successors by such name as they shall designate,

adopt and assume as aforesaid, shall be in law capable of purchasing, holding and conveying any estate, real or personal, for the use of the said association."

These sections of the act clearly indicate its nature, and show that the associations formed under its provisions are *corporations*. They possess all the characteristics of corporations, and must have been so declared to be, had not the legislature thought proper so to designate them.

Before testing the act by the constitution, it is proper to state here some of those general rules, of universal application, by which courts are guided in the interpretation of laws. Among these rules are the following: (1.) The words of a statute are to be taken in their ordinary signification and import. (2.) The real intention, when accurately ascertained, will always prevail over the literal sense of terms. 1 Kent's Com. 462; Dwarris on St. 40. (3.) The reason and intention of the lawgiver will control the strict letter of the law, when the latter would lead to palpable injustice, contradiction or absurdity. (4.) When the words are not explicit, the intention is to be collected from the occasion and necessity of the law, from the mischief felt, and the remedy in view; and the intention is to be taken or presumed according to what is consonant to reason and good discretion. (5.) The cause or reason of the act may either be collected from the statute itself, or discovered from circumstances extrinsic of the act. Dwarris on St. 44. (6.) The construction to be put upon the act must be such as is warranted by, or at least not repugnant to, the words of the act; and where the object of the legislature is plain and unequivocal, courts ought to adopt such a construction as will best effectuate the intentions of the lawgiver; but they must not, in order to give effect to what they suppose to be the intention of the legislature, put upon the provisions of a statute a con-

struction not supported by the words, though the consequence should be to defeat the object of the act.

I have thought it most convenient thus to collect and state the foregoing rules, as I shall have occasion to apply them in the course of this opinion.   They are equally as applicable to the interpretation of written constitutions, as of statutes.   The want of skill and foresight, and the imperfections of language, give rise to the same doubts and difficulties in the construction of the one as of the other; although, from the greater care and deliberation exercised in the formation of written constitutions, the difficulties in their interpretation arise less from looseness or ambiguities in expression, so often found in statutes, than from the difficulty in ascertaining the true object, scope, and spirit of those broad principles of fundamental law, which can only be expressed in general language.

I will now proceed to consider the natural import of the words used in that provision of the constitution, which it is contended has been violated by the act in question. Under the territorial government, and under the state government until the general banking law was passed, the usual mode of creating a corporation was by a special act adapted to each particular case.   With respect to banks or monied corporations, the practice was uniform; the only exceptions to the general rule embraced a class of corporations denominated *quasi*-corporations.   It is fair then to infer, that when the framers of the constitution made use of the words "act of incorporation," they had reference to the practice which had prevailed from the organization of the territorial government down to the period of the adoption of the constitution.   A general law, by.which individuals, to the number of twelve, could multiply indefinitely monied corporations, was unknown in the history of legislation, either in this state or any other state or country.   It is an invention of modern times.   It

was the fruit of a distempered state of the public mind. It had its origin at a period, and under circumstances, well calculated to tax the ingenuity of even legislators, to invent means, by which monied institutions, so called, might be brought into existence, without going through the dry, tedious, and expensive process, of passing an act in each particular case. The public voice demanded a machine which might operate with more celerity, and be put in motion at any time without the special intervention of the legislature, which sat but once a year, and for a short period. The circumstance, then, that the mode devised by the legislature for establishing banks was unknown, may be properly considered, in giving a construction to the constitutional provision under consideration.

Again: do not the words "the legislature shall pass no act of incorporation," &c. necessarily imply that the act itself would create the corporation? Such would seem to be the plain meaning of the words. If the language of the constitution had been, "the legislature shall pass no act *for the creation of corporations*," &c. a different interpretation would have been warranted, and the enactment of the general banking law might have been justified. But the words actually employed by the framers of that instrument, would appear to negative the idea that a corporation could be created in any other manner than by the direct act of the legislature. In written constitutions, we are accustomed to look for, and have a right to expect, clearness and perspicuity of style and language. Each provision is presumed to have been deliberately considered and carefully guarded, so as to leave no room for doubt or uncertainty. The history of the past had offered admonitory lessons of the danger of using language which might admit of a twofold construction, and thus subject the fundamental law to be moulded in such form as to suit the purposes of those who might invoke the aid of the legis-

lature, in carrying into effect some favorite scheme, not warranted either by its letter or spirit ; and the position I held in the convention enables me to state, that unusual care was taken by that body, to avoid the evils which inevitably flow from inattention in the use of language.

Where a provision of the constitution is couched in language explicit and clear, this Court is restrained from enlarging or restricting the plain and obvious import of such provision. We are bound to presume that the framers of that instrument intended to do precisely what they purport to have done. Neither the legislature nor the judiciary can enlarge or limit the meaning of a provision, when its language admits of but one construction. If this were permitted, constitutions would be of little value. Interpolations would from time to time be made by legislatures and courts, and the result would be, that, instead of a constitution and form of government traced by the hand of the people, we should have a constitution possessing, it is true, some of the features which belonged to the original, but so unlike it in other respects, as to be difficult of recognition :—in other words, we should have a constitution with the will of the legislature and courts impressed upon it, rather than the will of the people. Against such evils we must guard ; to the exercise of such power, we are bound to oppose a firm resistance.

It is fully admitted that, in the absence of any constitutional inhibition, it would be competent for the legislature to give a general power to erect corporations indefinitely. Angel & Ames on Corp. 45. This power might be vindicated on the principle that *qui facit per alium, facit per se ;* the persons to whom such power is delegated being only instruments in the hands of the government. Do the words, then, of the provision under consideration limit this power ? If a literal construction is to be given to that provision, it would certainly indicate an intention on the part of the

makers of the constitution to restrain the legislature from the exercise of such a power. If not, why use the words, "the legislature shall pass *no act* of incorporation," &c., implying, *ex vi termini,* that the "act" should constitute the corporation? If the makers of the constitution intended to restrain the legislature from granting, by a general law, a license to individuals to erect corporations, why did they not employ language less liable to misconstruction? Why, for instance, was not the provision couched in the following language: "The legislature shall pass no act for the creation of incorporations within," &c.? In 6 Bac. Abr. 377, the following rule is laid down: "If an affirmative statute, which is introductive of a new law, directs a thing to be done in a certain manner, that thing shall not, even although there be no negative words, be done in any other manner." I have endeavored to show, that if we are to confine ourselves to a literal construction of the constitution, it is quite apparent that an act of incorporation cannot be passed, unless it receive the assent of at least two-thirds of each house. This, then, is the "certain manner" in which the "thing is to be done." Have the legislature prescribed, in the act, another "manner" in which the "thing is to be done?" I think they have. That act does not create incorporations; but is a general license to individuals to do certain things, which things, when done, shall constitute them a corporation. I think then that the letter of the constitution prescribes but one mode by which an act of incorporation may be passed, and a corporation created, and that it contemplates the *direct* vote of the legislature upon *each and every* act of incorporation.

This view of the constitution is strongly fortified by the opinion of Chief Justice *Nelson,* in the case of *Thomas* v. *Dakin,* 22 Wend. R. 76. He says, "Two different constructions of the 9th section are claimed. For the defen-

dant it is urged, that according to its true intent and meaning, *each corporation* thereafter to be created by the legislature, must receive the *direct assent* of two-thirds of the members elected.    While for the plaintiff it is insisted, that the provision is fairly complied with, when the assent of two-thirds is given to a general statute, establishing a system for the admission of voluntary associations to corporate privileges;—in other words, when the *assent is indirectly given* to the creation of each.    If we regard the clause as intended to check the undue multiplication of these bodies, it is quite clear that the former interpretation will most effectually attain the object.    It secures a perpetual restraint upon the creation, both in respect to the deliberation and judgment to be bestowed, as well as to the assent to be given, in each particular application; whereas, in the case of a general law, when once enacted, all further check upon the legislature is at an end."    The Chief Justice further remarks in another opinion, that to create a corporation by "bill" would seem naturally enough to require that the bill should purport, on the face of it, to create one; that the corporate body should be the direct result of its enactment into a law."    I can add nothing to the force of these views; they seem to me to be conclusive of the question.    And yet that learned Judge sustained the general banking law of New York; although he very frankly admits that the words of the clause are not decisive upon either view, nor their legal import free from doubt and difficulty.    "In such case," (says the Chief Justice,) "I agree that the Court ought not to pronounce the statute unconstitutional."    Judge *Cowen,* who agreed with the Chief Justice in sustaining the statute, remarks that "the restriction intended to be imposed, I am of opinion, relates entirely to the members whose assent is required, and not to any particular form in which the corporation is to be created, nor to the num-

ber of corporations provided for by the bill." And after remarking that the legislature of that state exercised the right of passing general statutes authorizing associations of individuals to incorporate themselves, he adds, "We must understand the constitution as recognizing the known modes of legislation, when nothing is said in it to the contrary." *Bronson,* J. did not concur in the opinion of the Chief Justice and Mr. Justice *Cowen,* "that the legislature had the constitutional power, although two-thirds may assent, to provide by a general law for the creation of an indefinite number of corporations." It is well to notice here, that the Chief Justice construes the section in the constitution of New York to mean the same as if the phrase " *by law,*" had been used instead of " *by bill;*" so that the clause would then read, " The assent of two-thirds," &c. " shall be required by every law creating," &c. If the Chief Justice was right in this construction of the section in the constitution of New York, it may be well doubted whether upon the face of the instrument *itself,* the conclusion to which he came was not warranted. But the language of our constitution is essentially different. " The legislature shall pass *no act of incorporation* unless," &c. I took occasion to say, in a former part of this opinion, that if the clause in our constitution had been, " the legislature shall pass no act (law) for the creation of corporations," &c. a different interpretation would be warranted ; for it must be admitted that there is a wide distinction between the words, " the legislature shall pass no act of incorporation;" and the words " the legislature shall pass no act for the creation of corporations," &c. When we speak of an act of " incorporation," we mean the act by which the corporation is created ; when we use the word " corporation," we mean by it the *political institution* itself. Angel & Ames on Corp. 3. The language of the constitution implies that each individual corporation should be the cre-

Green *v.* Graves.

ation of a special act of incorporation, while the words, " the legislature shall pass no act for the creation of *corporations*," might justify the conclusion that the legislature could authorize the *creation of corporations*, to an unlimited extent, by a plural law.   Upon a careful examination of the case of *Thomas* v. *Dakin*, I have come to the conclusion that it cannot be relied upon very strongly, as supporting the constitutionality of the general banking law of this state.   The Chief Justice admits that a doubt exists as to the true construction of the constitution, and very properly sustained the law.   Mr. Justice *Cowen* agreed with the Chief Justice in sustaining the law, while he disagreed with him respecting the object of the restriction contained in the constitution, and laid much stress upon the fact that the convention, which revised the constitution in 1821, were well advised that general laws had been passed, authorizing associations to form themselves into a corporation, and insisted that the court were bound to presume that, if the restraint contended for had been desirable, they would have imposed it in a clear and intelligible form.   Mr. Justice *Bronson*, as I have before remarked, considered the act as a violation of the constitution.

While the " bill to authorize associations for the purpose of banking" was under consideration in the legislature of New York, doubts arose as to its constitutionality, and a resolution was adopted calling upon the Attorney General for an opinion upon that question.   That opinion was given by Mr. *Beardsley*, then Attorney General, in which he declares that the provisions of the bill were repugnant to the constitution, and sustains his views in a brilliant masterly argument.   I do not cite that opinion as *authority* in this case, but refer to it to show the views of a lawyer of acknowledged ability upon a question of great public interest; and as entitled to some consideration, as it was given officially, and at the request of the legislature.

HARVARD LAW SCHOOL LIBRARY

The great questions involved in the case of *Thomas* v. *Dakin*, were considered by the Court of Errors in New York in the case of *Warner & Ray* v. *Beers*, 23 Wend. R. 103. The cause was argued with great ability by eminent counsel. Opinions were delivered by the President of the Senate, Mr. *Bradish*, the Chancellor, and Senators *Root* and *Verplanck.* The Court, however, came to the conclusion, that the associations formed under the law of New York *were not corporations,* and, of consequence, no decision was pronounced upon the question arising in this case.

I have laid it down as a sound rule of construction, that the real intention, when accurately ascertained, will prevail over the literal sense of terms; and further, that the reason and intention of the lawgiver, will control the strict letter of the law, when the latter would lead to palpable injustice, contradiction, or absurdity.

It becomes necessary, then, to inquire into the reasons and object of the constitutional provision in question, that we may be able to determine with accuracy its true spirit and meaning. The restriction contained in the provision is unusual, and repugnant to all our notions of a representative government, where the vote of a majority controls in primary assemblages of the people, at an election, in our legislative halls, and in courts of justice. So deeply has this principle taken root, that the patriotism of an individual is questioned, who does not readily submit to the will of a bare majority, in all cases where the voice of that majority is, by the constitution, or law, declared to be decisive. The framers of the constitution, therefore, in incorporating into that instrument a rule in opposition to a principle which lies at the foundation of our political system, must have found their justification in the conviction that such a provision was called for by imperious necessity, or from motives of policy, so strong and overru-

ling, as to authorize an innovation of a long established and deeply cherished maxim. Let me now advert to some of those "circumstances extrinsic of the act," for the purpose of discovering the "reason or cause of the act." The constitution of Michigan was formed in 1835. All who are familiar with the history of that period will bear testimony to the fact, that a strong public feeling existed against corporations, and especially in respect to those possessing banking powers. It may be said to have been the absorbing question of the day. The community were alarmed at the vast increase of corporations. They feared the power which such institutions were capable of wielding. The belief was entertained that this power had actually been wielded for bad purposes. It was argued that all corporations were, in a greater or less degree, monopolies, and hence the prejudices of the community were arrayed against them. It was alleged that, notwithstanding the gross corruptions and fraudulent conduct of banking corporations, they could not be reached, or be made amenable to justice and the violated laws of the country. It was boldly charged that bribery and corruption had been resorted to for the purpose of procuring or perpetuating charters. Regarded as contracts between the state and the company, they could not ordinarily be affected by legislative interference. Immunity was offered to the persons and property of the corporators, not invested in the corporate stock. Such were some of the circumstances under which the provision was incorporated into our constitution,—circumstances well calculated to challenge the attention of the convention, and induce that body to devise new guards, by which the community might be protected against the evils growing out of legislation in respect to corporations. But the object they had in view could not be achieved, unless some statutory check was imposed, by which to prevent the multiplication of

corporations. This was the crying evil: for, in proportion as they increased, in just that proportion would the evils to which I have adverted increase also. Chancellor *Kent,* who was a member of the convention that revised the constitution of New York in 1821, says that the convention "endeavored to check the improvident increase of corporations, by requiring the assent of two-thirds of the members elected to each branch of the legislature, to every bill for creating, continuing, altering or renewing any body politic or corporate." 2 Kent's Com. 271. Mr. *King,* who was also a member of the convention, and chairman of the committee on the legislative department, in reporting the section embodied in the constitution, referred to by Chancellor *Kent,* remarked that "the committee looked upon the multiplication of corporations as an evil," and that "they ought not to be increased, but should be diminished as far as could be done consistently with the preservation of vested rights." If such were "the extrinsic circumstances" and the reasons which induced the convention that framed our constitution to impose the restriction, is it not indisputable that we can give full effect to the intention of the framers of the constitution, and of the people by whom it was ratified, only by insisting upon such a construction as the words themselves justify; and that to affirm the general banking law of this state constitutional, would be warranting an interpretation at war, both with the letter and spirit of that instrument? Indeed, Chief Justice *Nelson,* in the case of *Thomas* v. *Dakin,* admits that the *intention* of the framers of the constitution of New York, would be best fulfilled by the construction contended for by the defendant. If such be the case, and the letter of the clause in question not only warrants, but demands a literal construction, I know of no power less potent than that of the people, competent to change, alter, or modify the clause. *We* are the mere

creatures of the constitution, bound by the highest motives to preserve it unimpaired, as it came from the hands of those by whom it was ordained and established. We *do not sit here to make constitutions and laws, but to expound them.* Who that is familiar with the opinions of the convention, or has consulted the journal of its proceedings upon the subject of corporations, can hesitate as to the true construction of the clause relating to this subject? Those opinions were hostile to the multiplication of corporations. Not only is this manifest from the clause itself, which requires a vote of two-thirds of each house to pass an act of incorporation, but the journal shows that that clause was *unanimously* adopted. That member would have been regarded as insane, who should have offered a separate proposition, or a proviso to the clause as it now stands, granting to the legislature a power to pass a general law, for the erection of monied corporations, at the will of any twelve inhabitants of the state. He would have been told that the proviso would not only defeat the object intended by the clause, but would be inconsistent with its letter, which contemplated that the discretion and judgment of the legislature should be applied to *each* and *every* act of incorporation. He would have been told, just as the legislature was, by whom the act in question was passed, that in less than one year after its adoption, more banks would spring into existence than there were organized counties in the state; and thus a clause, itself intended to guard the community against a state of things so fraught with mischief, would be defeated by the proviso. He would have been told, that the true policy of the people of this state, whose pursuits are essentially agricultural, would be to restrain, rather than extend, the facilities for multiplying banks. He would have been told that the experiment of creating banks in this way was yet unknown and untried;—an experiment too bold and dange-

rous for a people then taking the initiatory steps to form a state government, with a population of only 100,000;—that such an experiment had better be left to old and wealthy states. And who can doubt the wisdom and policy of the provision, as we find it in the constitution? If we consult the past, a lesson may be read well calculated to admonish the future legislatures of this state of the imminent peril of projecting measures relating to banking and currency;—that it is a subject too delicate, and too closely interwoven with the best interests of society, to be inconsiderately tampered with;—that it will not do to vest every twelve individuals in this state with the immense power of erecting, *ad libitum*, banking corporations, each with a capital of $300,000, based upon bonds, and secured by mortgages upon wild and uncultivated lands. And yet it has been gravely argued that, notwithstanding the inhibition in the constitution, that law can be sustained, which violates its letter and spirit;—that law which gave birth in twelve short months to some forty banks, with an aggregate capital of nearly $4,000,000, while there were in existence eighteen chartered banks, with an aggregate capital of over $2,000,000;—that law whose history was blackened with frauds and perjuries; under the operation of which individual and state credit staggered and at last fell;—a law which brought odium and reproach upon the state within a year after its enactment. I have not been unmindful of the fact that the policy of the act was attempted to be vindicated, upon the ground that, under the system of creating private corporations, which prevailed before the adoption of the constitution, but comparatively a small number of the community could participate in the rights, privileges and profits of banking; whereas, under the general law, the many might have privileges which before were enjoyed by the few; and hence the doctrine of equal rights and equal privileges, so much cherished by

the people, was respected.   In other words, that the law struck a death blow at the monopoly, which previously existed.   This reasoning is plausible;—but is it sound? All corporations are to a certain extent monopolies.   In the language of Mr. Justice *McLean,* in the case of *Beaty* v. *Knowles,* 4 Pet. R. 168, the " exercise of the corporate franchise is restrictive of individual rights."   If so, it is difficult to sustain the construction contended for by the plaintiff, on the ground of policy ; for in proportion as corporations are created, in the same proportion are the rights of individuals restricted; so that, although more individuals would, under the general banking law, become members of banking corporations, yet the consequence would be an increase of institutions admitted to be monopolies, and restrictive of individual rights.   The remedy for the mischief, then, would certainly be worse than the mischief itself; and I think a community, like an individual, should endure a lesser evil, if, in attempting to cure it, a greater one would be entailed upon them.

The case of *Falconer* v. *Campbell,* 2 McLean's R. 195, sustains the constitutionality of the " Act to organize and regulate banking associations."   It is an authority entitled to respectful deference, and I should have been better satisfied with my own conclusions, had they been sustained by the distinguished man and able judge who delivered the opinion in that case.   I have had occasion, already, in the course of this opinion, to express my views upon most of the reasoning upon which this decision of Judge *McLean* was based.   One or two other points, however, remain to be considered.   It is said that, notwithstanding the restrictive clause in our constitution, it would clearly be competent for the legislature to create several corporations in one act, and, if so, then an indefinite number may be embodied in one act; and if an indefinite number may be embodied in one act, why may not the legislature pass

a general law, authorizing the erection of an indefinite number of corporations, by the voluntary association of any given number of persons? It is not to be denied that there is plausibility in this reasoning. It is fully admitted that an act creating several corporations would be valid and constitutional. It would not violate the spirit of the prohibitory clause in the constitution, for the reason that the judgment and discretion of the legislature would be applied to each incorporation contained in the act; the responsibility of sanctioning each would be direct; whereas, in a law like that under consideration, the whole power and responsibility of erecting corporations is transferred, in fact, from the legislature to twelve or more individuals. This the framers of the constitution never contemplated. They intended that the legislature should be *directly* responsible to the people, for *each and every act of incorporation* they might in their discretion pass. To illustrate what I esteem a very strong view of the case: At the time the general banking law was passed, there were two banking institutions in an interior village containing a population of a few hundred inhabitants;—one chartered under the old Territorial Government, and the other by the first legislature that assembled under the state government. The second legislature passed the general banking law; and in a few weeks, or months, three or four additional banks came into existence under its provisions, and the singular spectacle was exhibited, of five or six banks in a small village. Upon whom did the responsibility rest of creating these banks? Why clearly upon those by whose *direct* agency they were brought into being, and not upon the legislature who gave a general license permitting the creation of an indefinite number of banks. It is true, that that legislature might be directly responsible *for passing the law granting the license,* but they certainly are not to bear the further burden of being re-

sponsible for the acts of those who choose to avail themselves of the provisions of the law. If this process of reasoning be correct, it is too plain to need illustration that the true spirit and meaning of the constitution was violated; for, by that constitution, it was clearly intended that each corporation should be created by the *direct* agency of the legislature, who should be responsible to the people for the discharge of the high trust reposed in them, and not shift off that responsibility on others to whom the trust of creating banks was never intended to be confided.

But it was contended in argument, that there had been a direct legislative sanction of the incorporation of the Bank of Niles, by an amendatory law which took effect on the 10th of January, 1838. This law covers the whole ground occupied by the original act, with some modifications of a salutary nature, and declares that all banking associations, incorporated under the act to which it was an amendment, should, within ninety days from the passage of that act, give the security required by the 6th section of that act, and should, in all other respects, be subject to, and governed by the provisions of that act. The reasoning of Mr. Justice *McLean*, as to the effect of this amendatory law, is as follows: "If it were then admitted, that under the first act the associations formed were not incorporated, are they not incorporated by the second? Its provisions confer corporate powers, and they apply to associations then subsisting under the former law. This designates these associations with as much certainty as if they had been specially named in the amendatory act; and can there be any doubt that this act would confer corporate powers on these associations, if, under the former, they had not received them? As it regards banking associations then subsisting, it could not be contended that the legislature disregarded the restrictions of the constitution, by creating or authorizing an indefinite number of banks.

These institutions were in operation; they were known and expressly sanctioned, and provisions which conferred corporate powers, were made to embrace them." The position assumed by counsel, and laid down by Judge *McLean*, is this: that admitting the original act to have been unconstitutional, and of consequence the institutions organized under its provisions to have been utterly void, yet, as the legislature did, by the amendatory act, reorganize them as existing corporations, those institutions which were before void, became, by virtue of the last act, valid. I am not prepared to admit, to the extent claimed by counsel, the potency of a legislative recognition of a corporation created by an act which was passed in violation of the constitution, and of course originally void. It is unnecessary to determine the effect in this case of such a recognition, inasmuch as the whole argument rests upon the assumed ground that, "to pass the amendment, the constitutional majority was necessary;" by which I understand that the amendatory act, in order to be valid, must have been passed with the concurrence of *two-thirds of each house*. But, is this true? Is such a construction warranted by the constitution, or the practice of the legislature under the constitution? I think not. The restriction with respect to the creation of corporations, contained in our constitution, was borrowed from the constitution of New York, which provides that "the assent of two-thirds of the members elected to each branch of the legislature shall be requisite to every bill creating, continuing, altering or renewing any body politic or corporate." The language of our constitution is, "the legislature shall pass no act of incorporation unless with the assent of at least two-thirds of each house." The restriction in the constitution of New York, it will be perceived, extends to the "creating, continuing, altering or renewing any body politic or corporate," while, in our constitution, the restriction ex-

tends simply to the power of the legislature to "pass" an "act of incorporation." I have had occasion to remark, that the restraint imposed is unusual, and cannot, therefore, be extended to a case not warranted by the words of the constitution. To *pass* an act of incorporation is one thing; to *alter or amend* an act of incorporation is another, and a different thing. The framers of the constitution may have thought it wise to require two-thirds of the members of each house to pass an act of incorporation, but unwise to extend the restriction so far as to require a vote of two-thirds to alter or amend such act. But we are not left to grope our way in the dark on this subject.

By reference to page 180 of the journal of the convention, it appears that the following provision was adopted, in committee of the whole, by the convention: " The legislature shall pass no act of incorporation unless with the assent of at least two-thirds of each branch thereof; and every act of incorporation shall contain a clause reserving to the legislature the power to alter or repeal it: Provided, that it shall require two-thirds of all the members elected to both houses to repeal any such act of incorporation." It is manifest from this provision, that, while two-thirds of the members of each house were required to *repeal* an act of incorporation, a mere majority was sufficient to *alter* it. Subsequently, the provision was amended by striking out all after the word "thereof." The practice of the legislature under the restrictive clause, it is believed, has been consistent with the constitution as it now stands, and with the views of the constitution expressed in the provision above quoted. The question arose in the first house of representatives which assembled under the constitution, and it was then decided that the restriction did not apply to bills amendatory of existing acts of incorporation. The same decision was made by me at the same session, while speaker of the house of repre-

sentatives, and sustained by that body. What the practice has been since that time, I have not had the leisure to examine into and determine. Whatever that practice may have been, however, I think it too clear for argument that the constitution does not warrant the construction contended for, nor was it intended by its framers that the assent of two-thirds of each house should be necessary to amend an act of incorporation. It may be stated here as a fact, that the amendatory act passed the house of representatives by a vote of 25 to 11, and the senate by a vote of 9 to 6.

It is to be lamented that the grave question we are now called upon to decide, was not presented to this Court at an earlier period, and immediately after the passage of the obnoxious act. Our decision would have stayed the torrent which has swept over the state with effects so desolating, and preserved individual and state credit from the stigma and reproach which befel both; and I regret that the question has now been forced upon our notice, satisfied, as I am, that the public interest, under existing circumstances, would be best promoted by sustaining the law.

The result of our deliberation then, is, that so much of the act under which the Bank of Niles was organized, as purports to confer corporate rights upon the associations organized under its provisions, is unconstitutional and void; and that the demurrer in this case must be sustained.

RANSOM, C. J. and FELCH, J. concurred in this result, but thought that the question of whether, under the constitution, the legislature had power to *alter* or *amend* an act of incorporation by a mere majority vote, as held by WHIPPLE, J., was not involved in this case, and therefore, on this point, they declined expressing any opinion.

GOODWIN, J. not having heard the argument, did not participate in the decision.

*Demurrer sustained.*