AKTIEBOLAGET MALAREPROVINSERNAS BANK, Respondent, *v.* AMERICAN MERCHANT MARINE INSURANCE COMPANY, Appellant.

AKTIEBOLAGET MALAREPROVINSERNAS BANK, Respondent, *v.* FEDERAL INSURANCE COMPANY, Appellant.

AKTIEBOLAGET MALAREPROVINSERNAS BANK, Respondent, *v.* ÆTNA INSURANCE COMPANY OF HARTFORD, CONNECTICUTT, Appellant.

AKTIEBOLAGET MALAREPROVINSERNAS BANK, Respondent, *v.* NATIONAL FIRE AND MARINE INSURANCE COMPANY, Appellant.

**Insurance (marine) — deviation — question whether voyage on which vessel was lost was a " deviation " one of law reviewable by Court of Appeals — meaning of word " deviation " as used in marine insurance — question of liability determined by language used in policy —" deviation " sufficient to relieve insurers of liability under reasonable interpretation of policies — rule of " departure from necessity "— departure to be excused must be necessary to preserve ship or cargo from imminent peril — words " direct or otherwise " permit stops at usual ports but not a separate and distinct voyage back to point of departure — applicability of clause of self-insurance.**

1. In an action to recover upon policies of marine insurance for the loss of a vessel, defended upon the ground of " deviation," the question whether the voyage, during which the vessel was lost, was covered by the policies or whether it was a " deviation " which relieved the insurers from liability, is a question of law, which is to be determined by applying the terms of the policies to the facts and which the Court of Appeals may review.

2. A " deviation," as the term is applied in marine insurance, means that the ship has made a departure from the stated route not contemplated by the parties to the contract, and not rendered necessary to save the ship or cargo. As in every other case of contract, the question of liability depends upon the terms used by the parties in connection with the nature of the voyage. The question is determined by the language used in the policy.

3. Where the policies in suit insured the ship against war risks " From New York to Gothenberg, whilst there and return to United

States Atlantic port or ports, Direct or otherwise," a reasonable interpretation of the policies would make of a return trip to Gothenberg, after the ship had left there to return to New York and reached a port in England, a "deviation" which relieved the insurers of liability.

4. The natural consequences of such return trip may not be escaped under the rule of "departure from necessity," where it appears that the ship was safe in the English port but her owners agreed with the British authorities to discharge her cargo, carry a cargo to Gothenberg and from thence to an English port, in order to obtain from such authorities, who controlled the supply, coal necessary to carry the vessel to New York. It is not every necessity that excuses a departure. The departure from the contemplated voyage, to be excused, must be one necessary to preserve the ship or cargo from imminent peril or danger, and, where there is nothing to show that the vessel could not remain where she was in safety, in going on a separate and distinct voyage back across the danger zone, for which an additional freight was received, and other insurance procured, the owners and the master acted voluntarily, and not from that necessity which permitted such a trip to be considered within and a part of the original voyage.

5. The words "direct or otherwise" permitted the ship to stop at the usual and customary ports in going from New York to Gothenberg, but did not cover a separate and distinct voyage back through the danger insured against simply for the purpose of getting coal.

6. A claim that the second voyage was occasioned by the British government; that the voyage was not voluntary; that it was forced upon the master and thus became necessary, if so, makes applicable a clause contained in all the policies except one warranting "free from any claim arising from capture, seizure, arrests, restraints, preemption or detainments by the British Government or their allies," and the insurance companies whose policies contained such clause are relieved from liability.

*Aktiebolaget M. Bank* v. *American M. M. Ins. Co.*, 211 App. Div. 608, reversed.

*Aktiebolaget M. Bank* v. *Federal Ins. Co.*, 211 App. Div. 608, reversed.

*Aktiebolaget M. Bank* v. *Ætna Ins. Co.*, 211 App. Div. 608, reversed.

*Aktiebolaget M. Bank* v. *Nat. F. & M. Ins. Co.*, 211 App. Div. 608, reversed.

(Argued October 14, 1925; decided November 24, 1925.)

APPEAL, in each of the above-entitled actions, by permission, from a judgment of the Appellate Division

of the Supreme Court in the first judicial department, entered February 7, 1925, affirming a judgment in favor of plaintiff entered upon a decision of the court at a Trial Term without a jury.

*D. Roger Englar, Vincent L. Leibell* and *Henry B. Potter* for appellants. The intermediate voyages from Swansea to Gothenberg and return to Hull were voluntary deviations from the voyage insured, which rendered the policies void as a matter of law, regardless of the purpose for which the voyages were made. (*Audenreid v. Mercantile Mutual Ins. Co.,* 60 N. Y. 482; *Snyder v. Atlantic Mutual Ins. Co.,* 95 N. Y. 196; *Stevens v. Commercial Mutual Ins. Co.,* 26 N. Y. 397; *Fernandez v. Great Western Ins. Co.,* 48 N. Y. 571; 3 Kent Comm. [4th ed.] 313; *Stevens v. Commercial Mutual Ins. Co.,* 6 Duer, 594; *Hearne v. New England Mut. Mar. Ins. Co.,* 20 Wall. 488; *Oliver v. Maryland Ins. Co.,* 7 Cranch, 487; *The Indrapura,* 171 Fed. Rep. 929; *Amsinck v. American Ins. Co.,* 129 Mass. 185; *Mount v. Larkins,* 8 Bing. 108; *Elliot v. Wilson,* 4 Bro. P. C. 470.) If the intermediate voyages to and from Sweden be regarded as compulsory, the warranty against British capture affords a complete defense under all of the policies excepting that of the National Fire and Marine Insurance Company. (*Roget v. Thurston,* 2 Johns. Cas. 248; *Standard Oil Co. v. United States,* 267 U. S. 76; *Anderson v. Marten,* [1908] A. C. 334; *Stevens v. Commercial Mutual Ins. Co.,* 6 Duer, 594; *Muller v. Globe & Rutgers Fire Ins. Co.,* 246 Fed. Rep. 759; *Magoun v. New England Marine Insurance Company,* 16 Fed. Cas. 483; *Schieffelin v. New York Ins. Co.,* 9 Johns. 21; *Matter of Glatzl v. Stumpp,* 220 N. Y. 71; *Bird v. St. Paul Fire & Marine Ins. Co.,* 224 N. Y. 47.)

*J. B. Engel* and *J. G. Engel* for respondent. The *Ada* did not deviate from her voyage; the main voyage was

not abandoned; the intermediate trip was in furtherance of the main voyage. (*Robinson* v. *Marine Ins. Co.*, 2 Johns. 88; *Post* v. *Phœnix Ins. Co.*, 10 Johns. 79; *Savage* v. *Pleasants*, 5 Binn. [Penn.] 403; *Lawrence* v. *Ocean Ins. Co.*, 11 Johns. 241; *Lawrence* v. *Fireman's Ins. Co.*, 14 Johns. 46; *Hughes* v. *Union Ins. Co.*, 3 Wheat. 185; *Kittel* v. *Wiggins*, 13 Mass. 268; *Stevens* v. *Commercial Ins. Co.*, 26 N. Y. 401; *Snyder* v. *Atlantic Ins. Co.*, 95 N. Y. 203, 204; *Fernandez* v. *Great Western Ins. Co.*, 48 N. Y. 573; *North British Ins. Co.* v. *Baars*, 255 Fed. Rep. 625; *Audenreid* v. *Mercantile Ins. Co.*, 60 N. Y. 482; *Maryland Ins. Co.* v. *Leroy*, 11 U. S. 26; *Coffin* v. *Neuberry Port Ins. Co.*, 9 Mass. 436.) The ship was lost by a peril against which she was insured. (*Bradhurst* v. *Columbia Ins. Co.*, 9 Johns. 9, 17; *Schieffelin* v. *New York Ins. Co.*, 9 Johns. 20; *Patrick* v. *Commercial Insurance Co.*, 11 Johns. 9; *North British & Mercantile Ins. Co.* v. *Baars*, 255 Fed. Rep. 625; *Gates* v. *Madison Co. Mut. Ins. Co.*, 5 N. Y. 469; *Mathews* v. *Howard Ins. Co.*, 11 N. Y. 9; *Saugerties Bank* v. *Del. & Hud. Co.*, 236 N. Y. 425; *McCahill* v. *New York Trans. Co.*, 201 N. Y. 221.)

CRANE, J. The plaintiff has recovered four judgments upon four marine insurance policies issued respectively by the American Merchant Marine Insurance Company, the Federal Insurance Company, the Ætna Insurance Company, and the National Fire and Marine Insurance Company. The four actions were tried together with five others before the court, without a jury. The policies covered the steamship *Ada* against war risks, and are substantially similar in form. The issues in all the actions are the same, with the exception of the one against the National Fire and Marine Insurance Company. The policy in that case did not contain the warranty clause against capture and detention by the British government.

The judgments have been unanimously affirmed by the Appellate Division so that we must take the facts as they are stated in the findings. It is the claim of the appellants that these facts show a deviation relieving the insurers from liability. The *Ada* was insured for a voyage from New York to Gothenberg and return. It was while making a fourth trip across the North Sea that she was torpedoed by a German submarine and sunk. The defendants say they insured for two trips across the sea but not for a third and fourth, and that these were not within the terms of the policies.

A question has arisen as to the plaintiff's insurable interest. The facts regarding this are set forth in the opinion below (211 App. Div. 608) and need not be repeated here. We will assume for the purposes of this appeal that the plaintiff may recover if the loss comes within the policies.

Turning now to the findings, we have these events and circumstances. At the times mentioned herein the steamship *Ada* hailed from the Kingdom of Sweden and sailed under the Swedish flag; that on or about the 26th day of September, 1916, while the steamship *Ada* was at the port of New York, the defendants insured the ship by the policies in question at and from New York to Gothenberg, whilst there and return to the United States, Atlantic port or ports, direct or otherwise, against risk of capture, seizure or destruction, or damage by man-of-war, letters of marque, by takings at sea, arrests, restraints, detainments and acts of kings, princes and people, authorized by and in the prosecution of hostilities between belligerent nations.

On or about the 30th day of September, 1916, the *Ada* sailed from New York bound for Gothenberg, Sweden, on the voyage described in the policy, and arrived safely, in due course.

On the twenty-fifth of November following, the *Ada* having discharged her cargo at Gothenberg, Sweden, and

having taken on a cargo, duly sailed on her return trip to New York.

After leaving Gothenberg, she was hailed by a British man-of-war and directed by the officer in command to proceed to the port of Stornoway, Scotland, where on or about December 5, 1916, she arrived in company of said British man-of-war. She remained there until about December 23, 1916, when she was directed by the British authorities to proceed to Bristol, England. She arrived there in due course, and remained under the direction of the British government until April 21, 1917.

On that date the owners of the *Ada* finally prevailed upon the British authorities to permit her to sail from Bristol, England, upon her voyage to New York, but at that time she was unable to commence said voyage by reason of having insufficient coal aboard to safely undertake it. On leaving Gothenberg, the steamer had sufficient coal to take her to New York, but by reason of the detention by the British government, her coal supply had given out, so that she had to have more coal to cross the Atlantic. The British government controlled the coal supply required by ships sailing from Scandinavian ports.

How was the *Ada* to get her coal? The findings continue. The owners of the steamship *Ada* continuing their efforts to replete the supply of bunker coal sufficient to enable the ship to safely make the voyage to New York finally succeeded, so that at or about that time (April 21, 1917) the British authorities agreed to furnish the steamship *Ada* with a supply of bunker coal sufficient to enable her to complete her voyage, upon condition, however, that the said steamship *Ada* first discharge the cargo she had taken aboard at Gothenberg, carry a cargo to Gothenberg and from thence to an English port, having done which the British authorities agreed to allow the steamship *Ada* to procure sufficient bunker coal to carry her to New York. Under these circumstances the steamship *Ada* discharged at warehouse in Bristol the cargo she had

taken aboard at Gothenberg, took on a cargo of coal at Bristol, which was the cargo directed by the British authorities to be loaded aboard her, and carried same to Gothenberg, Sweden. This cargo she discharged at Gothenberg, Sweden, and pursuant to the direction of the British authorities took on another cargo, and with it sailed from Gothenberg, Sweden, to Hull, England. For the carriage of the coal back to Gothenberg, the owners of the vessel received freight in the sum of $80,361.90. For her voyage from Gothenberg back to Hull, the freight moneys amounted to $85,942.50. On this voyage of the vessel from England back to Sweden and return, the vessel was insured by the owners, which is not the insurance here in question.

On the ninth day of June, 1917, as the *Ada* was thus sailing from Gothenberg, Sweden, back to Hull, England, she was sunk by a German submarine, and totally lost.

The other findings bearing upon the question of deviation, so far as they are findings of fact and not conclusions of law, are to the effect that from the time the steamship *Ada* was hailed by the British man-of-war, the master was unable to continue the voyage to New York, because the supply of bunker coal had become insufficient to complete the trip; that it was the intention of the steamship *Ada* and her owners to take up her cargo again after she had returned from Gothenberg on her second trip, and which cargo she had discharged at Bristol, and to carry such cargo to New York, being the voyage she had originally undertaken when she had sailed from Gothenberg, Sweden, to New York on the voyage described in the insurance policies. It is also found that the only way open to the *Ada* to procure a sufficient supply of bunker coal to enable the ship to steam to New York was to make the trip back to Gothenberg as agreed with the British government.

Having all these facts, the statement made in finding 23 that the trip back to a Swedish port was not an

independent voyage, but subordinate to, and in further-ance of the main voyage, is a conclusion of law which we are permitted to review upon this appeal.

The finding that the proximate cause of the loss of the steamship *Ada* was a torpedo discharged by the German submarine, in the course of the prosecution of the war then waging between Great Britain and Germany, was made in view of the clause stamped on the policies, with the exception of that issued by the National Fire and Marine Insurance Company, reading as follows:

" Warranted free from any claim arising from capture, seizure, arrests, restraints, preemption or detainments by the British Government or their Allies."

The conclusion reached by the trial justice in his 23rd finding of fact, above referred to, is the point involved in these cases. Was the voyage back to Gothenberg the voyage covered by the policies, or was it a deviation which relieved the insurers from liability? This is a question of law which is to be determined by applying the terms of the policies to the facts. A " deviation," as the term is applied in marine insurance, means that the ship has made a departure from the stated route not contemplated by the parties to the contract, and not rendered necessary to save the ship or cargo. As in every other case of contract, the question of liability depends upon the terms used by the parties in connection with the nature of the voyage. The cases which have been brought upon marine insurance policies turn upon the intent of the parties and the voyage contemplated, as expressed in the contract. (*The Will-domino*, 300 Fed. Rep. 5, 18; *Seccomb* v. *Provincial Ins. Co.*, 10 Allen [92 Mass.], 305, 315; Phillips on Insurance [5th ed.] vol. 1, p. 555.) "A deviation from the described course or employment of an insured vessel, unless compelled by necessity, * * * constitutes a defense to an action thereon for a subsequent loss, however slight or harmless the deviation may appear to be." The

question is determined by the language used in the policy. (*Snyder* v. *Atlantic Mutual Ins. Co.*, 95 N. Y. 196.) Arnould on Marine Insurance (Vol. 1 [11th ed.], 558) puts the question this way: " Was the port one which, on the true construction of the policy, was within the course of the voyage as contemplated by the parties? " And again, in section 411:

" 1. That the extent of the powers they confer on the ship is to be judged of, not so much by verbal criticism on the terms employed (such as ' to call,' ' to touch,' or ' to touch and stay '), as by reference to the true scope and nature of the adventure contemplated by the policy.

" 2. That, however extensive the language of these clauses may be, they can never confer a power of visiting ports out of that which, upon a fair construction of the whole policy, appears to have been the course of the voyage insured as contemplated by the parties; nor can they justify the ship in visiting any port, even though within the local limits of the voyage insured, for any purpose unconnected with the main object of the adventure."

These insurance companies and the insured made a contract whereby the steamship *Ada* was insured against loss from German submarines going from New York to Gothenberg and back. What must the parties have had in mind in making this contract; what was the risk assumed and insured against? This was a war risk. The parties knew that certain waters had become dangerous to ships because of submarine activities. For pay the insurance companies were willing to assume the risk. The risk, however, was limited to one voyage over and back through the danger zone. To get to Gothenberg on the west coast of Sweden, it is necessary for ships to go through the North Sea. Everyone knew at the time that this was a particularly dangerous place, made so by the war. The risk was created by warships. If the *Ada* went through the North Sea back and forth without

being torpedoed, it was the insurer's gain. If she were destroyed, it was the insurer's loss. This must have been within the contemplation of the parties, and the chances which they voluntarily took as part of this business transaction. Is it fair to assume that either party to the policy contemplated that after the *Ada* had gone into the North Sea and come out again without harm, she would go back and make another trip through the danger zone, and that the policy would cover such a voyage? I think not. The policy reads: " From New York to Gothenberg, whilst there and return to United States Atlantic port or ports, Direct or otherwise." The policy covered two trips through the North Sea, going and coming. It did not cover a third and fourth trip, which of course materially increased the risk. The reasonable interpretation, therefore, of the policies here in question would make of this return trip to Gothenberg a deviation which relieved the insurers of liability. It was a sailing on a different voyage from the one insured. (*Robertson* v. *Columbian Ins. Co.*, 8 Johns. 383; *Audenreid* v. *Mercantile Mutual Ins. Co.*, 60 N. Y. 482; *Seccomb* v. *Provincial Ins. Co.*, *supra*.) In the *Audenreid* case this court said: "A deviation is a varying from the route insured against without necessity or just cause after the risk has begun, and the effect of a deviation is to discharge the underwriters whether the risk is thereby enhanced or not. \* \* \* Whenever the insurance is upon a specific voyage, there is an implied condition to be performed by the assured that the ship shall pursue the most direct course, and that the voyage shall be prosecuted to its final termination with a reasonable diligence and without unnecessary delays. Any failure to comply with this condition alters the nature of the risk assumed by the underwriters, and from the instant of such failure terminates the insurance. \* \* \* If the insured may break up a single voyage between the termini named in the policy, at his own pleasure or for his profit or convenience,

into several, by stopping at intermediate ports, he may essentially vary the risk, and the estimate of the underwriter will be of no value."

We do not understand the respondent to differ with this statement of the law as applied to the *Ada*, if her trip back to Gothenberg had been voluntary. The plaintiff seeks to escape from the natural consequences of this return trip by attempting to bring itself within the rule of departure from necessity. The *Ada* could not proceed to New York without coal. This was necessary to complete the voyage. Coal could not be procured from the British government which controlled the supply without going back to Gothenberg on another voyage. The cargo which the *Ada* was carrying to America was thereupon discharged at Bristol. She took on a new cargo and returned to Gothenberg. At Gothenberg she unloaded and reloaded, and again attempted to cross the path of the submarines. On this separate and distinct voyage the owners insured the ship against the risks which they knew she ran, and received additional freight charges. Wherein lies the necessity?

It is not every necessity that excuses a departure. The departure from the contemplated voyage, to be excused, must be one necessary to preserve the ship or cargo from imminent peril or danger. The steamship *Ada* with her cargo was perfectly safe in Bristol. She was there until April 21, 1917, by the command of the British government. On that date she was free to go. The restraint had been relieved. It was a fact that she could not go to America because her coal supply was depleted, but there is nothing to show that she could not have remained where she was in perfect safety. The coal necessity arose from the desire to complete the voyage, not from any danger to the ship or cargo. In going, therefore, on a separate and distinct voyage back across the danger zone, for which an additional freight was received, and other insurance procured, the owners and

the master acted voluntarily, and not from that necessity which permitted such a trip to be considered within and a part of the original voyage.

These parties, when taking out the insurance policies in New York, knew that a voyage across the seas permitted departures from the usual and customary route, compelled by necessity. Such is the law of marine insurance, applicable to all risks. It is the nature of the contract and of the undertaking which permits this apparent variance from the voyage described. The words of these policies " direct or otherwise " also permitted the *Ada* to stop at the usual and customary ports, in going from New York to Gothenberg. But neither the rule of necessity nor the words " direct or otherwise " covered a separate and distinct voyage back again a third and fourth time through the very danger which was the main cause for the policies in the first instance. As before stated, the defendants and the insured could never have contemplated that the rule of necessity permitting a departure from the course under certain dangers and perils would cover a material increase of the risk for the purpose of getting coal. The leaving of a place of safety, and going into such a known danger for such a cause was either an abandonment of the original voyage or else a deviation which took the risk without the terms and coverage of these policies.

Every policy and every case must be governed by the facts involved. As these vary, so must vary the application of the well-known principles of law applicable to marine insurance. What may be a necessity under one set of circumstances may not be in another. The giving out of fuel or of coal, while on a voyage may, under certain circumstances, require the ship to put into a nearby port for the purpose of replenishing the supply in the same way it can do in order to make repairs necessary to continue the voyage. The application of the rule of necessity, like so many other rules of like nature, must be

reasonable and depend upon the degree and circumstances of the departure from the usual route. A departure to get coal may be very reasonable in one case, and very unreasonable, and not within the contemplation of the parties, as we speak of it, in another case. This term, or phrase, " within the contemplation of the parties " virtually means that the thing done or the event which has happened comes reasonably within the fair intent and purpose of the contract. If the master of the *Ada*, safe in the port of Bristol, but without coal, could go to Gothenberg, a sail of nearly 600 miles or more, amidst war activities, to get coal, and still keep within the limits and terms of the original voyage, he might go with impunity to Calcutta or Hongkong, or any other far distant port, for like purpose.

If a vessel insured to a particular port, having letters of credit, should find on arrival that the parties on whom they were drawn had failed, she could not go to another port for funds and return for her cargo, and be protected by her policy. This was the illustration used by the court in its opinion in *Burgess* v. *Equitable Marine Insurance Co.* (126 Mass. 70, 79). We cite that case as showing when necessities will justify departures. The court said:

" In this connection it may be well to refer to the necessities which clearly justify a departure. There is no deviation when the master is compelled by force, either to depart from his route, or delay its prosecution by the acts of his crew; *Elton* v. *Brogden*, 2 Str. 1264; *Driscol* v. *Passmore*, 1 B. & P. 200; *Driscol* v. *Bovil*, 1 B. & P. 313; or where he is detained by those in authority, or taken out of his course by a ship of war. * * * In cases of this description there must be a *vis major*, compelling a departure or delay, which excuses the master. So where the master is obliged to leave his course, or delay by stress of weather or other peril of the sea, or to go into port to repair or refit, or to re-man or recruit his crew dis-

14

abled by sickness or reduced by casualties, or to avoid capture or to join convoy in time of war, there is no deviation. * * *

" Nor is the departure from the route for the purpose of saving human life a deviation; nor is a policy avoided when the ship goes out of her course to obtain necessary medical assistance for those lawfully on board. *Bond* v. *Brig Cora*, 2 Wash. C. C. 80. *Perkins* v. *Augusta Ins. Co.*, 10 Gray, 312. In this class of cases the justification does not rest on the same ground as in those previously noticed. It is allowed from motives of humanity, and cannot be extended to the saving or protection of property. In all other cases the necessity must be a real and imperative necessity affecting the vessel, such as actual force preventing the master from exercising his will, peril of the sea, danger of capture, want of repair, disability of the crew, or unseaworthiness, occurring under such circumstances that the master, acting upon his best judgment for the interest of all parties, has no alternative, and is forced to leave his route, or delay its prosecution."

For the reasons here stated we are of the opinion that at the time the *Ada* was sunk she was not upon the voyage insured by these defendants; that her returning to Gothenberg was a deviation from her route or trip, relieving the insurers.

Coming to this conclusion, it is probably unnecessary for us to consider the other clause in all of the policies excepting the one issued by the National Fire and Marine Insurance Company. That clause reads: " Warranted free from any claim arising from capture, seizure, arrests, restraints, preemption or detainments by the British Government or their Allies."

On November 25, 1916, the *Ada* was stopped by a British man-of-war and taken into Stornoway in the Hebrides, and from there to Bristol, England, where her cargo was discharged, and the vessel and cargo thoroughly searched. She was not released by the

British government until about April 21, 1917. During this time of her seizure and detention by the British government, the vessel came within this clause of the policy and was at the risk of the insured for any damage or loss occasioned thereby. If she had been torpedoed during the time of capture or detention, there could have been no recovery on these policies. (*Standard Oil Co. of New Jersey* v. *The United States*, 267 U. S. 76; *Queen Insurance Co. of America* v. *Globe & Rutgers Fire Ins. Co.*, 263 U. S. 487; *Andersen* v. *Marten*, App. Cases, 1908, p. 334.) It may be doubtful whether this clause followed the ship after its voluntary departure in April for Gothenberg. This trip, as before stated, was a matter of choice with the master. It was not forced upon him by the British government. True, it was compulsory in the sense that he could not sail for America until he got coal, and he could not get coal without making the trip for the British government. It is also true that his coal supply would not have given out except for the detention in Bristol. Was the loss of the vessel on June seventh, when sunk by a torpedo, due to this detention by the British government? We need not decide this question or express any opinion about it, as the other point disposes of these cases. It may be said, however, that the insured claims that the second voyage was occasioned by the British government; that the voyage was not voluntary; that it was forced upon the master and thus became necessary, avoiding the consequences of the deviation. If this be so and the ship at the time it was sunk was proceeding not voluntarily, but under compulsion of the British government, by force of its orders and commands, or as a direct consequence of its restraints, then this clause does apply, and the insurance companies are not liable. We are inclined to think that the plaintiff by the position which it has assumed, to avoid the consequences of a voluntary departure from the insured voyage, comes perilously near to making itself an insurer under the warranty clause.

For the reasons here stated, the judgments below should be reversed, and the complaints dismissed, with costs in all courts.

CARDOZO, POUND, McLAUGHLIN, ANDREWS and LEHMAN, JJ., concur; HISCOCK, Ch. J., not sitting.

Judgments reversed, etc.