## BORUP et al. v. WESTERN OPERATING CORPORATION et al.

### No. 287.

Circuit Court of Appeals, Second Circuit.

July 30, 1942.

Writ of Certiorari Denied Oct. 26, 1942.

See ⎯ U.S. ⎯, 63 S.Ct. 77, 87 L.Ed. ⎯.

382

Herbert Lebovici, and Melton, Lebovici & Arkin, all of New York City, for appellants.

Thomas J. Blake, of New York City (James A. Walsh, of New York City, of counsel), for appellees.

Before L. HAND, AUGUSTUS N. HAND, and CLARK, Circuit Judges.

L. HAND, Circuit Judge.

This is an appeal from a decree disposing of a libel in rem against the American whaling ship Ulysses, and in personam against her owner and master, for wages and damages upon a voyage in 1939 and 1940. The libellants signed the articles in Sandefjord, Norway, about September 19, 1939, before an American consular officer; they also signed at the same time a separate printed contract with the owner, which is the important document here.

This described the duration of the voyage in three alternate ways: "(a) * * * from Sandefjord on a whaling trip to the Antarctic and thence to Sandefjord or port of discharge"; "(b) for a period of one season"; "(c) until signing off, which can only take place at Sandefjord." The parties did not mark on the contract which of these was to govern, though the printed form directed this to be done; since, however, the case has proceeded on the assumption that the first option was incorporated, we shall treat the voyage as being from Sandefjord and back to Sandefjord "or port of discharge." The wages were a base pay prescribed in each contract and a bonus. There were also incorporated in the contract an "Arbitral Award" between the Norwegian Seamen's Union and the Whaling Employers' Association on September 13, 1939 and another agreement between the Association and three Norwegian unions, dated September 12, 1939. Some provisions of the "Arbitral Award" should be stated.

### Par. 4

"1. Wages run from and including the day of entering the service until discharge occurs."

"16. Money shall not be paid out on the journey except upon arrival at unloading ports where money may be paid out in amounts up to one-half month's wages."

"17. The wages continue running under all circumstances until the crew's arrival at the place of signing on."

### Par. 8

"2. The crew-member may be discharged wherever the Company should so desire. In case of discharge, the crew-member can claim free travel and full pay to the place of signing on."

"3. If the crew-member himself desires to be signed off at a place other than the place of signing on, and this is granted, his wages shall then cease and travel expenses home disallowed."

"7. If the manager so desires * * * it is the duty of the crews to spend the winter in any foreign port whatsoever. The crews shall receive for wintering in such cases an addition of 50% to their wages."

The Ulysses left Sandefjord on October 7, 1939 and stopped en route at St. Helena Bay, Cape Colony, to fuel the "killer" boats. While approaching the harbor on November 24th she struck a rock, not shown on the latest chart (1937), and suffered such damage that she had to put in to Durban, Natal, for temporary repairs. These were completed by December 22d and the catch was begun on December 29th, three weeks after the season opened. The commissioner has found that the Ulysses carried the latest chart, and that the grounding was not due to her negligence, and the judge affirmed the ruling. At the close of the season the vessel started for Sandefjord, where she would ordinarily have arrived on May 1, 1940; but on April 10th she learned of the President's proclamation, No. 2394, 54 Stat. 2693, promulgated that day under the Neutrality Act, 22 U.S.C.A. § 441 et seq. which forbade all American ships to go to Norway then occupied by the Nazis. She therefore made for New Orleans, where she arrived on April 26th and where she discharged her whole cargo of whale oil. (Some of the catch was brought in another bottom to Carteret, New Jersey.) She then went to New York for permanent repairs, arriving on May 10th, and by May 15th the whaling voyage was over for all purposes for which the seamen were needed, except that a few of the crew were kept to man the navigating and engine rooms and to victual the ship.

At New Orleans the immigration authorities had served notice upon the master to keep on board all the libellants because they were aliens, and a similar notice was served at New York on May 10th. In pursuance of these, all were detained except for occasional shore leaves granted, and except 96 of the crew of 250 who "shipped foreign" on other vessels. The master posted a notice on the ship that any members of the crew who wished to "ship foreign" would be allowed to do so, and those who did, signed off. On June 29th the Ulysses went to the Robins Dry Dock in Brooklyn to be converted from a whaler into an oil tanker. Some members of the engine room and some cooks and stewards stayed on board and performed the usual duties of their employment; there is no dispute that they are entitled to their base wages until their service terminates. The others, after May 15th and until September 1st, did various jobs around the ship which the master assigned to them, jobs unlike anything required on a whaling voyage; but after September 1st they were ordered not to work any more, though they continued to live on board.

The commissioner found that the value of the services rendered by them after May 15th was no more than the value of their maintenance. After May 10th all the libellants knew that they could not leave the ship except on shore leave; after May 15th that the whaling voyage had ended; and after May 19th that they would be allowed to "ship foreign" if they chose.

On July 1, 1940 they filed the libel and served the owner at once, but they did not arrest the ship until October 11th. The 154 who did not "ship foreign" claim (1) their base wages under the contract until the arrest of the ship—October 11th; (2) their share bonus (at so many cents a barrel of the catch); (3) a sliding scale bonus depending upon the average sale price of the oil; (4) a war bonus after July 1st (in accordance with the "Arbitral Award"); (5) transportation charges to Sandefjord (repatriation) or its equivalent in money; (6) additional wages for "overwintering." They also claim damages because the ship was negligent in going ashore in St. Helena Bay and losing three weeks of the killing season. Those who "shipped foreign" claim only 2, 3 and 5. The judge before whom the matter came on an interlocutory motion referred the trial to a commissioner, who reported as follows. 1. That the voyage ended on May 15, 1940. 2. That the base wages of all the libellants (except the engineers, cooks and stewards) ended six weeks thereafter, i.e. June 30th (the estimated duration of a voyage from New York to Sandefjord). 3. That the wages of those who signed off before June 30th ended when they did so. 4. That only those were entitled to repatriation who asked for it before signing off and before November 10, 1940. 5. That the base wages, including overtime, war bonus and share bonus, were due at the time of the report, October 11, 1940, and also the base wages of those who had performed their regular services thereafter. 6. That the sliding scale bonus would be due after the catch had been sold. 7. That the libellants were not entitled to any "overwintering" payment. 8. That the grounding was not caused by any negligence. 9. That those who signed off and "shipped foreign" were not entitled to any repatriation. The judge affirmed all these findings except the one fixing the time within which they must elect repatriation, which he extended until thirty days after the entry of the decree,

December 13, 1940. The libellants alone have appealed.

The first and most important question is when the base wages ended. The libellants agree that they ended when the ship was arrested, followng The Charles L. Baylis, D.C., 25 F. 862; they also agree that they ended for those who "shipped foreign" when they signed on with another ship. They do not agree that they ended at the expiration of such a period after May 15, 1940, as a return from New York to Sandefjord would have consumed, though they do not challenge the finding that six weeks was a reasonable time to fix for such a return. The ship argues that when they filed the libel in personam for wages on July 1, 1940, they ended any right to further wages, because under the contract they were not entitled "on the journey" to more than "one-half month's wages." A suit for full wages therefore presupposed that the "journey" was at an end. Judge Brown seems indeed to have adopted that reasoning in The Charles L. Baylis, supra, but since it would award wages for six weeks beyond July 1, 1940, by virtue of the clause, "wages continue running until the crew-members return to the place of signing on," we shall not decide the question, because for other reasons we think that wages ended on May 15th.

■ The voyage was to end at Sandefjord "or port of discharge," unlike the third option which was "until signing off which can only be at Sandefjord." How far the third option would have been modified by the provision in the printed contract which gave the ship the privilege of discharging seamen at any place (§ 2, Par. 8), we need not inquire; the first option did so provide unless it can be read to mean where the vessel herself "discharged." Nobody contends that it can be so read and it would not improve the libellants' position if it could. Thus the owner promised to take the seamen back to Sandefjord, reserving the privilege of discharging them where it would, a privilege conditioned, however, by their right to "free travel and full pay to the place of signing on." Although the parties engaged in a great deal of fruitless negotiation in New York after May 15th, and although the judge made no findings on the matter, it is entirely plain that the owner did not fulfill this condition, regardless of any other conditions which our own statutes may have

imposed upon the privilege. The reason in part was that, being owned principally in Norway, it could not get any funds; in addition, the parties were in conflict as to how much was due. The libellants have argued the case as though they were affirmatively entitled to a discharge, and could recover because no lawful discharge was ever effected. In this they are mistaken. As we have said, discharge was a privilege reserved to the owner by which it could cut short its obligation to pay wages until the ship returned to Sandefjord, but it was not a promise to perform the conditions on which a discharge depended. The result of the owner's failure to avail itself of the privilege was merely to leave unconditional the promise to carry the seamen to Sandefjord. The obligation was in that case no different from the obligation in the third option; and there was no reason why any occurrence, which would have been a good excuse for failure to perform the promise in the third option, should not be an equally good excuse for a failure to perform that in the first. The fact that the owner had reserved a power to avoid performance added nothing to the stringency of the promise if he did not exercise the power, and an ineffectual effort to use the power was no different from no effort to use it at all.

■ Therefore the issue is whether the President's proclamation of April 10, 1940 excused the undertaking to end the voyage at Sandefjord. It forbade all American ships to go to Norway, among other places, and disobedience was made a crime; and if it had in terms forbidden this perpetually, there can be no doubt that it would have excused the owner; for a promisor is excused, except in unusual circumstances, if performance becomes unlawful by a change in the law made after the contract was executed. Restatement of Contracts § 286. The libellants answer that the proclamation did not "frustrate" execution of this contract, but merely suspended its performance, relying chiefly upon two decisions of Justice Story. In the first of these (The Saratoga, Fed.Cas. No. 12,355) the seamen had signed on for a voyage from Boston to a European port and thence to a port of discharge in the United States. The ship went to Portsmouth, England, was captured by a French privateer outside that port on April 26, 1812, and was taken to Roscoff in Brittany

to await condemnation. She was restored to the master in January, 1813, and the crew, who had been sent to Morlaix as prisoners, returned and did such work as the master ordered until they went back to the United States in a cartel ship as exchanged prisoners in July, after the master had discharged them in order that they might do so. War between Great Britain and the United States had broken out in June, 1812. The seamen asked for wages until their discharge in July, 1813, but this was denied though they were allowed a quantum meruit for the work done in France. The reasoning was that, although the capture did not of itself end the voyage, since it could not be known in advance whether condemnation would follow, a state of war between Great Britain and ourselves finally put an end to the voyage by making any further prosecution of it criminal; and that what put an end to the voyage put an end to wages, except that by statute the seamen might recover two months' pay because they were discharged in a foreign port. This was followed some twenty years later by Brown v. Lull, Fed. Cas.No. 2,018, in which the ship was seized during the French occupation of Naples in 1809 and condemned in March, 1810, although eventually an award was made to her owners which included the freight back to the United States. The libellant had insisted upon staying with the ship until after the decree of condemnation when he came back in a cartel ship. Story, J., held that he was entitled to his wages until condemnation, though not thereafter because condemnation finally ended the voyage; but he did award wages until the seaman's return because the award in restitution had included freight, and wages "would attach, by way of trust or lien, to that fund." In Beale v. Thompson, 4 East 546, the King's Bench held that a sea cook was entitled to wages while the ship lay in the harbor of St. Petersburg under a Russian embargo, on the theory that the embargo suspended but did not terminate the voyage, which finally completed after the embargo was lifted. Hadley v. Clarke, 8 Term.Rep. 259, held the same thing between shipper and carrier.

■ The question at bar therefore comes to whether the proclamation should be understood, like an embargo, merely to have suspended the voyage which the owner might later have resumed, or wheth-

er it should be considered to have finally put an end to it. In the first event the owner was thrown back upon its privilege of discharging the men at New York which, as we have seen, it never exercised; in the second, it was excused from further prosecution of the venture, the seamen being sufferers along with it. It is of course true that nobody can say with theoretical certainty that the proclamation might not have been withdrawn the next day; for that matter, peace might have been declared during the summer of 1940. But in The Saratoga, supra, the war of 1812 might also have been ended soon enough to allow the voyage to be continued. A seizure preparatory to condemnation as prize is avowedly temporary, the vessel may be acquitted and go her way; or she may be ransomed before decree. Goodrich v. Gordon, 15 Johns., N.Y., 6. The question must be answered by some test which can be applied at the time when a decision must be made. That test should be whether the interruption then appears to have put an end to the voyage for all practical purposes; that is to say, that nobody with good sense would think it sound commercial judgment to keep matters in statu quo until the period of interruption might end. In appraising such an opportunity it may be that a ship in a foreign port is in a different position from the Ulysses; she must at some time go back, if she can. But a ship in her home port should not be required idly to lie to until a war has ended, in order to unlade in a foreign port or to take back her crew to the port where they shipped. Judged by that test, there can be no doubt that the proclamation excused the ship here. Congress had plainly said that no American ships should go within the restricted waters; it did not change its purpose until we were ourselves at war; it was not likely to change. The war had every appearance of being bitterly fought to an end; France had not fallen and was still thought formidable. Any one looking at the situation on May 15, 1940 would have said that it was to the highest degree improbable that the Ulysses could go to Sandefjord for a matter of years. That excused her, and wages stopped at least six weeks thereafter.

It may indeed be asked why they did not stop on May 15th with the voyage itself. It is true that the "repatriation" provision (§ 2, Par. 8) was dependent upon a discharge and that, as we have said, there had been no discharge; but it would be a harsh construction of the contract which should exclude from that section a termination of the voyage by frustration. Be that as it may, we need not decide the point, because the owner does not dispute liability to all those who did not "ship foreign." It does dispute its liability to those who did, and it is plain that if the contract is to be the measure of the obligation, § 3 should be included as well as § 2; and § 3 excludes those who "shipped foreign." If, on the other hand, the proclamation ended the contract for all purposes, obviously those who "shipped foreign" have no claim. As to the limitation, imposed upon the 154 who have been allowed the "repatriation," that they must declare their purpose in season, it was proper. The allowance was given, not as a bonus, but to enable the men to reach home at the owner's charge. The Hawaiian, D.C., 33 F.Supp 985, 987; The Prahova, D.C., 38 F. Supp. 418, 426. There is no reason why they should not now decide whether they wish to return to Norway as soon as they can; they are not entitled to an equivalent payment in gross if they do not, and it is reasonable that the matter shall not be allowed indefinitely to drag along. The claim for "overwintering" requires no discussion; the master never "required" the crew to lie over, he would have been glad to have them all ship on other vessels.

There remains only the claim for damages due to the delay at Durban to make temporary repairs. We do not say whether, if the grounding had been negligent, the owner would have been liable for the loss; arguendo, we shall assume that it would, but it is impossible to find the least basis for saying that the accident was due to the ship's negligence. She had the latest chart; so far as appears nobody had ever had any intimation that there was a rock until she struck it. Nothing could be unfairer than to hold the owner for such an occurrence.

Decree affirmed.