**CALMAR S.S. CORP. v. SCOTT et al.**

**CALMAR S.S. CORP. v. UNITED STATES.**
Nos. 184 and 185, Docket 22253 and 22254.

United States Court of Appeals,
Second Circuit.

Argued March 4, 1952.

Decided May 12, 1952.

Edwin S. Murphy, New York City, Kirlin Campbell & Keating, New York City, Ira A. Campbell, Helen C. Cunningham, New York City, of counsel, for the Calmar Steamship Corporation.

Walter B. Hall and Russell T. Mount, New York City, Mendes & Mount, New York City, for respondent underwriters.

Edward L. Smith, Myles J. Lane, U. S. Atty., New York City, Admiralty Division, for respondent United States.

Before L. HAND, AUGUSTUS N. HAND and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

### I.

The first of these suits was brought by the Calmar Steamship Corporation against Scott and others, underwriters upon a policy of marine insurance, covering the libellant's ship, "Portmar," for a voyage from a United States Pacific port to the Philippines and return to a U. S. Pacific or Atlantic port through the Canal. The meaning of the policy is extremely difficult to grasp, owing to the confused and contradictory provisions in the "riders," which were attached to the ancient standard form of Lloyds, and which they completely superseded. We shall assume, however, that the labyrinth of verbiage, within which lurks whatever contract was made, is to be understood to agree that, although the ship might at the time be under the "restraint of princes," the policy should cover her loss, if that was occasioned by attacks of airplanes. We shall also assume that she became a "constructive total loss" through such attacks. These assumptions we may make because we hold that the policy was no longer in force when the loss occurred, the insured voyage having before then come to an end and the policy with it. The "Portmar" left San Francisco on November 28, 1941, bound for Manila, laden with war supplies only. That was less than a fortnight before the Japanese attack upon Pearl Harbor on December 7th, of which the master heard by wireless on the same day, when he was 600 miles to the southwest of Hawaii. Fearing that he might encounter Japanese ships or planes if he kept on his prescribed course, he at once turned due south, awaiting further orders which he got on the 11th, and which directed him to go to Suva, Fiji Islands. That port he reached on the 20th, where he got further orders to go to Sydney, Australia, and he arrived at that port on the 30th. These, and all later, orders came either from American naval officers, or from Australian officers who had been given authority to act for American officers. By the time the ship reached Sydney, not only had war broken out between Japan and ourselves, and between Japan and Great Britain, but the Japanese had sunk the British ships "Repulse" and "Prince of Wales"; and the judge found that this, following, as it did, upon the substantial annihilation of our own fleet at Pearl Har-

bor, "gave the Japanese full battle fleet command of the Pacific" and a "naval superiority which enabled them to transport troops to almost any desired point * * * and establish it for an air-naval fueling base." On January 2nd the "Portmar" was ordered to go to Brisbane on the east Australian coast 529 miles north of Sydney, her cargo still unbroken, and there she berthed on the 5th. She at once received orders that her cargo "was to be discharged, sorted and part of it reloaded, together with other cargo"; and on the 9th she left Brisbane under orders to report at Port Darwin, about 2100 miles distant, where she arrived on January 19th, after being for a part of the time under the escort of Australian corvettes. Here all her cargo —both what was left of that lifted in California and what was lifted at Brisbane— was discharged except 1500 drums of high octane gasoline, which she was directed to deliver at the nearby port of Wyndham, together with 500 drums, which she had carried to Port Darwin, and which had been discharged but reloaded. On her return—apparently light—from Wyndham to Port Darwin, she was laded with another military cargo—including field pieces, a naval launch and ammunition—to reinforce the defence of Koepang across the Timor Sea, north of Australia. With this cargo and a contingent of troops on board she set out on February 15, but when 250 miles out she was on the next day attacked by Japanese planes, and was ordered back to Port Darwin where she arrived on the 18th. While in the roads awaiting a berth to discharge, she was attacked on the 19th by swarms of Japanese planes and through "near misses" and gunfire suffered injuries that eventually forced her master to beach her, and, as the libellant asserts, made her a "constructive total loss."

Even though we take all the other issues in the libellant's favor, the crucial question remains whether the dominion asserted over the "Portmar" by the American and Australian military authorities beginning at Brisbane had before February 19th put an end to the possibility of that return voyage for which alone the underwriters meant to insure her. From the time she was taken over at that port on January 5th until she was riddled by gunfire on February 19th, she had been under the absolute control of military authorities; no dominion could be more complete than, after discharging all but a small part of her outbound cargo at Brisbane and Port Darwin, to lade her with a partially new cargo, order her to Wyndham, fetch her back to Port Darwin, and set her out again as part of the military expedition to Koepang, upon so dangerous a mission that the commander of the cruiser which was to act as an escort, told her that he would not risk his ship in the harbor of Koepang. The extent of this dominion being so comprehensive and absolute, the only question is as to its prospective duration. Was it certain to last beyond any period which the underwriters assumed that the return voyage would take; or if it is impossible to be "certain," was it for practical purposes beyond reasonable doubt that it would? That depended upon the condition of affairs in Australia during January and February, 1942. The testimony is uncontradicted that everyone responsible for the defence of that continent believed that its northern coasts at any rate were in the direst straits, and that the shortage of shipping was one of the most pressing dangers. Until the naval battle of the Coral Sea which was in May the Japanese carriers could range about unobstructed; and Japanese forces might land where they would, substantially unopposed.

We might indeed take judicial notice of much of this; but it is not necessary to do so for the same conclusion is inescapable from the testimony. Those in charge of the defence of the country seized and held anything that would float throughout the rest of 1942, and perhaps longer. Plant, an American Colonel, arrived at Melbourne at the end of March, as "Chief of War Transportation in the Southwest Pacific area, to organize and to operate water transportation down there." Immediate invasion of the northern part of the continent was threatened; the navy had abandoned Port Darwin; even the east coast down to Brisbane had been ordered evacuated. The army and navy took con-

trol of "every vessel we could get our hands on." There were not many, because Great Britain "had drawn practically all coastal ships from Australia," whose "life depends upon coastal shipping and they were desperate for covering their own needs, so we"—the military—"had very few Australian vessels we could depend upon. * * * We were looking around desperately for anything that was afloat or could be made to float," and Australia had few repair yards. It made no difference whether a vessel was owned or chartered by the U. S. or by anyone else; military considerations alone governed, commercial were disregarded.

The extremity of the need for ships is illustrated by what was done in this very instance. The "Portmar" for a week after the attack lay beached at some distance from Port Darwin, subject to a tidal rise and fall of 27 feet; most persons thought her worthless, indeed the libellant still strenuously maintains that she was not worth her repairs. Stowed in her holds were a number of field pieces which were sorely needed and it was found possible to unlade and salve them. In the process the officer in charge came to believe that the hull also might be salved, since there appeared to be no structural damage beyond the openings made by the concussion of shells and by gunfire. Therefore, after the lower holes had been plugged at low tide, she was floated and brought back to Port Darwin when she was enough reconditioned to venture upon a trip back to Brisbane. The earlier part of this was infested with Japanese ships and planes, and the ship, in charge of a picked crew though not under her own power, had to lie concealed in some bight during the day and move only at night. Moreover, this required her to hug the coast, and very greatly increased the distance to be covered. At Brisbane she was repaired and was later put in drydock at Sydney.

The total cost of the repairs was $91,000, to which should be added $55,000 for towage and $20,000 for salvage: $166,000 in all. When all was done, it did not restore her to "commercial operating condition"; "it was strictly a patch job"; it made her "perfectly seaworthy but without any thought of restoring" her "to commercial operating condition," though enough to permit her "to be operated in Australian waters." The War Shipping Administration took title to her on November 17, 1942, and she made a few trips before she was torpedoed and sunk.

These facts seem to us to prove as well as practical affairs permit that when she was taken over at Brisbane it was practically certain that she would continue to be employed in military service for a period far extending beyond her return voyage, a period which in every probability would outlast the year and certainly would extend over six months. We do not forget that on January 19th the libellant learned from one, Freeze, a traffic manager of the U. S. Lines, that Lavino & Company, who supplied the Bethlehem Steel Company with large amounts of ore, "was going to load a cargo of chrome ore at New Caledonia for discharge at Philadelphia." Freeze had been the agent of the Maritime Commission for the charter in suit, and it was from him that the libellant first learned that the "Portmar" had reached Australia. He said that the ship would load on her return voyage the latter part of February, for discharge at Philadelphia about the middle of April. This testimony was hearsay, it is true, but the respondents did not object to it and it was admissible.[1] However, it proved at most no more than that the Maritime Commission on January 19th still meant the "Portmar" to complete the prescribed voyage by a return to the U. S.; and that was the day on which she had arrived at Port Darwin, a fortnight after she had reached Brisbane. There is no

1. Schlemmer v. Buffalo, Rochester & Pittsburg Ry. Co., 205 U.S. 1, 9, 27 S.Ct. 407, 51 L.Ed. 681; Diaz v. United States, 223 U.S. 442, 450, 32 S.Ct. 250, 56 L.Ed. 500; Kansas City Southern Ry. Co. v. C. H. Albers Commission Co., 223 U.S. 573, 596, 32 S.Ct. 316, 56 L.Ed. 556; Rowland v. Boyle, 244 U.S. 106, 108, 37 S.Ct. 577, 61 L.Ed. 1022; Continental Oil Co. v. United States, 9 Cir., 184 F.2d 802, 813.

evidence that the Maritime Commission knew the uses to which the military authorities in Australia had already put her and were intending to devote her. Nor is there any reason to suppose that if it had known, it would, or indeed could, have taken her out of the control of the military. The termination of the voyage depended upon the purposes of those who had power to direct her movements; their purposes alone counted in determining whether the insured risks still continued. While it is true that the "requisition for title" was not made until November, that indicated no more than that only then did they resolve to make their possession permanent. It did not indicate that they had not from the beginning meant to use her as long as their critical needs lasted, or that those needs would not continue throughout the year. The impending Japanese seizure of at least the whole north coast, whether it succeeded or not, would result in an emergency that would be anything but temporary.

■ The question is whether the policy survived the seizure. The case for the plaintiff can be put most plausibly as follows. It is true that in the "rider" marked "B.C.2" the underwriters agreed that the "restraint of princes" should excuse their undertaking, but to this they made some exceptions, among which were losses caused by "gunfire * * * or other implements of war." Granted that it is necessary to find in the maze of documents outside "B.C.2" some added provision that the losses were "otherwise covered by this policy"; such a provision is to be found in the "rider" marked "F-300," which insures risks of "military or naval aircraft and/or other engines of war." Hence it appears that notwithstanding that she might at the time be under "restraint of princes," she was insured against exactly that kind of loss which she suffered. Having expressly so dealt with the subject of "restraints of princes," and having provided when they should excuse liability and when they should not, the underwriters may not now argue that, although the loss was one of those which they had accepted, they are not liable because the "restraint" was

of an especial kind: *i. e.,* one which had already caused a "frustration" of the voyage. If they had intended not to cover all "aircraft" losses which might occur during a "restraint of princes," they should have said which of such "restraints" they meant to exclude.

■ Although this has a literal plausibility, it overlooks the fundamental subject matter of the insurance: *i. e.,* the "Portmar" on the prescribed voyage. All provisions of the policy must be read with that limitation in mind; for they were all ancillary and implementary to that purpose. We do not forget that the policy contained the following exception: "Warranted free of any claim based upon loss of or frustration of the insured voyage or adventure caused by restraints of kings" etc. Neither party has argued that this applies to the loss of the ship; and in fact it does not, for it is limited to claims for losses of the voyage as such, not of the ship. Yet a possible argument might be made that this excuse of the underwriters in the case of a "loss of or frustration of the voyage or adventure" excluded all excuses for any other kind of loss arising from a "frustration" of the voyage, under the principle: *expressio unius, exclusio alterius.* That would be an illegitimate inference. The clause only excused a loss which had to occur while the policy was in force: *i. e.,* the policy would not have ended before the loss occurred; and the loss in question, as we shall show, occurred after it had ended.

We have found no decision under a marine policy which is certainly relevant, but there are two cases in our courts and one in England, where the question arose as to whether the owner or the charterer was entitled to the ship's earnings after requisition, and the controlling considerations are relevant to those which should control here. We held in The Claveresk, 2 Cir., 264 F. 276, that the owner was entitled to the requisition hire even on a time charter which had still fourteen months to run and which contained a "restraint" clause; and the Fourth Circuit held the same in the case where the charter had over three years to run. The Isle

of Mull, 4 Cir., 278 F. 131. The House of Lords in the well known case of F. A. Tamplin S. S. Co. Ld. v. Anglo-Mexican Petroleum Co. Ld. (1916), 2 A.C. 397, discussed the situation more thoroughly than any other court has done, and, although the decision was in favor of the charterer by a three to two vote, the opinions— "speeches"—of three of the judges—the two dissenters and one of the majority— did not differ as to the proper principle, though one of them did as to its application to the facts. The charter had been for five years, of which nearly three remained when the Crown requisitioned the ship in December, 1914, only a few months after the outbreak of war. Lord Parker of Waddington and the Lord Chancellor, Lord Buckmaster, did indeed hold that, even though it had been proved,—which they thought it had not—that the requisition would in all probability extend beyond the remainder of the term, the interruption was covered by the "restraint clause" because a time charter is not a contract for a specific venture, but for any uses to which the charterer may order the ship to be put. Apparently, they would have held for the charterer in any event. The other three, Lord Loreburn, Lord Haldane and Lord Atkinson, held that, if the interruption were reasonably likely to exceed the term, the stipulated venture—though a time charter—had come to an end. Lord Loreburn, however, thought that in fact the requisition might turn out to be only an interruption, and, if so, that it was within the "restraint" clause, while Lord Haldane and Lord Atkinson thought that the prospective duration of the requisition was too indefinite to be classed as an interruption. The point upon which all agreed is that, had the case involved a voyage charter, the owner would have succeeded, provided it was reasonably sure that the requisition would extend beyond the limit of the proposed voyage. In Texas Company v. Hogarth Shipping Co., 256 U.S. 619, 41 S. Ct. 612, 65 L.Ed. 1123, the charterer in a voyage charter sued for damages because

the ship was requisitioned, but was defeated because the requisition had "frustrated" the venture: i. e., the continued availability of the ship to the charterer. However, since there appears to have been no "restraint" clause, the point now at bar was not involved. In The Kronprinzessin Cecilie, 244 U.S. 12, 37 S.Ct. 490, 61 L. Ed. 960, a shipper sued the ship for failure to perform a bill of lading which did contain a "restraint" clause. The main contention was that in fact there had been no "restraint," but the court did not find it necessary to pass on this, because the presence of the "restraint" clause did not forbid the inference of an implied condition that the ship need not expose herself to capture. In all such cases the prospective length of the interruption on which the putative "frustration" depends, must be decided by the situation as it appears at the time of the interruption.[2]

 It appears from the foregoing decisions that in a time charter, not only does a "restraint" clause not extend the prescribed period, but that if the "restraint" is likely to last beyond the term, it presently puts an end to the charter. Logically it might be thought not to do so, at least so long as the ship was put to uses to which the charterer might have put her. In such cases, if the charterer was content with the requisition hire, there would seem to be no objection to allowing him to receive it, provided he paid the charter hire.[3] Other considerations apply to the case of a voyage charter, in which the charterer becomes entitled only to direct the services of the ship between the *termini* prescribed, and within the period customary in such cases. When such a charter contains no "restraint" clause, it is hard to see how any "restraint," involving as it must a deviation, can fail to "frustrate" the venture, unless it is trifling. When the charter does contain a "restraint" clause, it must however excuse some deviations from the limits, prescribed both in time and route; but it is not clear just how extensive these may be, except that they should not post-

2. Borup v. Western Operating Corp., 2 Cir., 130 F.2d 381; Jackson v. Union Marine Insurance Co., L.R. 10 C.P. 125.

3. Earn Line S. S. Co. v. Sutherland S. S. Co., D.C., 254 F. 126, 131, 132.

pone the completion of the voyage to a time when the purposes of the "venture" have ended, commercially speaking, even though, physically speaking, the ship may still complete the voyage. A policy, upon a voyage charter must be understood to be coextensive with the voyage, and the "restraint" clause should be construed as it would between the owner and the charterer. Of course the underwriter does accept some extension of his liability upon such risks as he continues to assume pending the "restraint"; but he should not be taken to accept extensions that, commercially speaking, put an end to—"frustrate"—the venture as the parties contemplated it. It is obviously impossible to lay down in general terms what such extensions will be; each case must depend upon its circumstances, but it is clear that the importance of the extension will depend, not only upon its length, but upon the changes in the risks to which the new employment of the ship will expose her while it lasts. In the case at bar the requisition added so notably to the risks of the prescribed voyage that the voyage ceased to be the same. In the first place, although the round voyage was expected to be from the end of November to the middle of April—less than five months—the duration of the requisition at the very shortest estimate would have been twice that length, and probably more nearly three times as much. But that was not the only change which it effected in the risks, though it would really have been enough to put an end to the policy. A round voyage from San Francisco to Australia and Philadelphia was one thing; and it was a very different thing to an underwriter from the same voyage, broken by an interlude of six months or more of hovering about the coasts of Australia in the year 1942, exposed to the continuous and unimpeded attacks of Japanese planes and naval vessels, especially should the ship chance to be used not only to carry materials for defence, but as a transport. It seems to us that so much to deviate from the prescribed voyage was to substitute a quite different voyage and that the change may not justly be regarded as

provided for by the conventional clause providing for a "restraint of princes." We are not referred to any decision which has held that that clause permits so wide a departure from the subject matter of the policy. As in all such cases, we must interpret the written words by trying to place ourselves in the position of the parties, had they been faced in advance with the actual event: the seizure at Brisbane. After making every allowance for the *canon contra proferentem* and its especial application to an insurer, we cannot believe that they would have agreed that the clause so far transmuted the undertaking. We hold that the voyage ended at Brisbane and that the policy then ceased to cover the ship.

Decree reversed; libel dismissed.

## II.

■■ It remains to consider the suit of the libellant against The United States. If the charterer had so wished, the ship might have been employed either in "foreign commerce," or to carry "commodities essential to the national defence"; but, according to the finding, she lifted only "high octane gasoline in drums * * * at Oakland, California, and military equipment, supplies and ammunition * * * at San Francisco," all en route for Manila. The gasoline was concededly destined for war planes, so that in fact she was used to carry nothing but "commodities essential to the national defence"; i. e., war materiel; and it is abundantly established that such a ship, while so employed, is not "employed as a merchant vessel." In The Western Maid, 257 U.S. 419, 42 S.Ct. 159, 160, 66 L.Ed. 299, the Supreme Court considered the immunity from lien of collision of three ships, of which the "Western Maid" was one. She was owned by the U. S. and had been employed as a transport, but at the time of the collision she was "loaded with foodstuffs for the relief of the civilian population of Europe". In answer to the assertion by the U. S. of its sovereign immunity the libellant "suggested" that she "was a merchant vessel", which the court answered by saying, 257 U.S. at page 432, 42 S.Ct. at page 160,

that "she was engaged in a public service that was one of the constituents of our activity in the war and its sequel and that had no more to do with ordinary merchandizing than if she had carried a regiment of troops." Although the collision had occurred before the passage of the Suits in Admiralty Act, 46 U.S.C.A. § 741 et seq., it was after that of the "Shipping Act, 1916,"[4] § 9 of which made all vessels "purchased, chartered, or leased from the Board * * * while employed solely as merchant vessels * * * subject to all laws, regulations, and liabilities governing merchant vessels". Thus, substantially the identical words in a substantially identical context were involved, and the "Portmar" was certainly not "employed as a merchant vessel" during the period here involved. We decided the same point in Bradey v. United States, 2 Cir., 151 F.2d 742, as did Judge Ward in The Norman Bridge, D.C., 290 F. 575 and Judge Augustus N. Hand in United States v. City of New York, D.C., 8 F.2d 270; and the Supreme Court at least recognized the doctrine again in United States Grain Corporation v. Phillips, 261 U.S. 106, 111, 43 S.Ct. 283, 67 L.Ed. 552. That ends any possibility of basing the libel upon the Suits in Admiralty Act,[5] because that act annexes as a condition to the consent of the U. S. to be sued that the vessel as to which the claim arises shall be "employed as a merchant vessel". This appears from the following analysis of the first two sections of the act. Section 2 gives such a consent "in cases where if such vessel were privately owned or operated," the claimant might sue in the admiralty. "Such vessel" refers back to § 1 which describes the vessels which shall be exempt from "arrest or seizure" as those which the U. S. "shall

own," or which shall be in its "possession," or which shall be "operated by or for" it. It is obvious that a vessel under a voyage charter to the United States is operated "for" the United States—indeed, were it not so, "for" would be redundant. Hence the condition that the vessel shall be a "merchant" vessel attaches to a vessel under a voyage charter.

We cannot understand what is the significance of the fact that the "Portmar" was not a "public vessel" and that no suit would lie under the "Public Vessels Act,"[6] unless the argument be that, if there be no relief under either the Suits in Admiralty Act or the Public Vessels Act, we should assume that a suit will lie for the *casus omissus*. In the first place it has not been decided that the libellant has no relief in the Court of Claims; and, even though it does not, certainly we may not imply a consent by the United States to be sued when it has not expressly agreed.

■ The decree for $238.50 presents a theoretical difficulty. The libel asked for damages upon three claims: the first, for hire; the second, for failure to insure; the third, for exposing the "Portmar" to enemy attack. We are not clear under which of these the claim for victualling the supercargoes should fall. Moreover, we do not find it necessary to decide whether, if it can be regarded as a separate claim, the District Court had jurisdiction to decide it under the Tucker Act, 28 U.S.C.A. § 1491. It was not so pleaded, nor has the libellant suggested anything of the sort. We hold that it was part of the larger claim, and that as such the District Court had no jurisdiction over it.

Decree reversed and libel dismissed for lack of jurisdiction.

4. 39 St. at L. pp. 728–738, 46 U.S.C.A §§ 801 et seq., 808.

5. §§ 741, 742, Title 46 U.S.C.A.
6. §§ 781, 782, Title 46 U.S.C.A.