CALMAR STEAMSHIP CORP. *v.* SCOTT ET AL.

No. 303.   Argued January 15, 1953.—Decided April 27, 1953.

*Edwin S. Murphy* argued the cause for petitioner. With him on the brief were *Ira A. Campbell* and *Helen C. Cunningham.*

By special leave of Court, *Hubert H. Margolies* argued the cause for the United States, as *amicus curiae,* urging

reversal. With him on the brief were *Solicitor General Cummings, Assistant Attorney General Baldridge* and *Samuel D. Slade.*

*Russell T. Mount* argued the cause for respondents. With him on the brief were *Walter B. Hall* and *Wilbur H. Hecht.*

MR. JUSTICE FRANKFURTER delivered the opinion of the Court.

This is a suit in admiralty against British underwriters on a war-risk policy issued to cover the Calmar Corporation's S. S. *Portmar* for a voyage, in the winter of 1941–1942, from the United States to a port or ports in the Philippine Islands and return to an Atlantic or Pacific port in the United States. After the voyage had commenced Australia was duly substituted for the Philippine Islands as the outbound destination. The *Portmar* was under charter to the United States. This suit, based on damage inflicted by enemy aircraft, was tried together with a libel against the United States claiming recovery for the same damage as well as additional charter hire. See *post,* p. 446. The District Court held the underwriters liable for a constructive total loss of the vessel. 103 F. Supp. 243. The Court of Appeals reversed. 197 F. 2d 795. We granted certiorari, 344 U. S. 853, because wide use, so the Court was advised, of the clauses of this policy makes their construction, a necessary issue here, a matter of more than individual concern.

Pursuant to the charter agreement between the Calmar Corporation and the United States, the *Portmar* left San Francisco for Manila on November 28, 1941. She carried high-octane gasoline, ammunition and other military supplies and equipment. She was some 600 miles southeast of the Hawaiian Islands on December 7, when Pearl Harbor was attacked. Her master at that time put her

on a southerly course so as to avoid the combat area. On December 11, United States naval routing orders were received by radio on the *Portmar*. From that day until she was damaged and abandoned, a little over two months later, her every movement was in obedience to orders issued by competent United States and Australian authorities. The *Portmar*, which flew the American flag, was subject to these orders.

On December 30, the *Portmar* arrived at Sydney, Australia.[1] Without being permitted to discharge cargo, she was dispatched up the coast to Brisbane. There her cargo was unloaded and sorted, part of it was put back on her, and she was sent almost half-way around the island to Port Darwin. She had been in Brisbane a week and had left on January 9, 1942. She was in Darwin on the 19th and lay at anchor till the 31st, waiting to dock and discharge cargo. This she then did, in part. Still carrying two thousand drums of her original load of gasoline, she left on February 4 for a relatively short trip across Joseph Bonaparte Gulf to Wyndham, where she arrived on the 8th. She returned empty to Darwin

---

[1] Not until January 19 did word reach Calmar that the *Portmar* had been diverted to Australia from the original course she had set for Manila. This was not due to any negligence on the part of the master, who throughout the adventure made sturdy and insistent efforts to keep in touch with his owners. It was simply the result of security regulations imposed by the proper authorities, and of difficulties of communication. When Calmar received this news, it chose to act under a clause in the policy providing:

"Held covered in the event of any breach of warranty as to date of sailing or deviation or change of voyage, provided prompt notice be given these Insurers when such facts are known to the Assured and/or their managers and an additional premium paid if required." Calmar communicated the change in destination to the underwriters. The latter agreed to hold the *Portmar* covered by letter dated February 6, 1942. This agreement was retroactive. No additional premium was required.

on the 12th. She then took aboard troops with equipment and armament and joined an exceedingly perilous expedition to Koepang, on the Island of Timor, some 500-odd miles northwest of Darwin. This expedition ran into heavy air attacks and turned back. On the 18th of February, the *Portmar* was at Darwin again, awaiting her turn to dock and discharge the personnel and equipment she had taken on. While thus at anchor on the morning of the 19th, she underwent bombing and strafing by Japanese airplanes and sustained the damage which forced her master to beach her and caused him to abandon her.

Article 2.17 of the charter agreement under which the *Portmar* sailed provided that her owners might obtain war-risk insurance, to be paid for by the United States. Before commencement of the voyage, Calmar took out the war-risk policy now in question on the hull and machinery of the *Portmar,* valued at $860,000. This policy insured "only against the risks of war, strikes, riots and civil commotions." It was assembled—that seems an appropriate word—by superimposing on the age-old Lloyd's form layer upon layer of warranties and riders. Warranties free the underwriters from obligations imposed by riders, and subsequent riders then reimpose obligations thus avoided.

"Touching the Adventures and Perils which we the Assurers are contented to bear and do take upon us in this Voyage," the basic Lloyd's policy states, "they are, of the Seas, Men-of-War . . . Enemies . . . Takings at Sea, Arrests, Restraints and Detainments of all Kings, Princes and People . . . ." The policy is then "warranted free from . . . capture, seizure, arrest, restraint or detainment, or the consequences thereof . . . or any taking of the Vessel, by requisition or otherwise . . . also from all consequences of hostilities or warlike operations . . . ." This warranty is known as the capture and seizure war-

ranty. It is superseded by a war-risk rider, which provides:

> "It is agreed that this insurance covers only those risks which would be covered by the attached policy . . . in the absence of the C. & S. warranty . . . but which are excluded by that warranty.
>
> "This insurance is also subject, however, to the following warranties and additional clauses:—
>
> "The Adventures and Perils Clause shall be construed as including the risks of piracy, civil war, revolution, rebellion or insurrection or civil strife arising therefrom, floating and/or stationary mines and/or torpedoes whether derelict or not and/or military or naval aircraft . . . and warlike operations and the enforcement of sanctions by members of the League of Nations . . . but excluding arrest . . . under customs or quarantine regulations, and similar arrests, restraints or detainments not arising from actual or impending hostilities or sanctions."

A further warranty, known as the free of British capture warranty, carves a specific exception out of the war-risk rider. It holds the underwriters

> "free of claims arising from Capture, Seizure, Arrest, Restraint, Detainment, Requisition, Nationalization or Condemnation by or under the authority of the government of Great Britain or any of its dominions . . . or allies, or by any forces acting in co-operation with or under the control of them or any of them."

But a saving clause, following immediately, provides that

> "unless the insured Vessel is condemned this warranty shall not exclude losses otherwise covered by this policy which are caused by gunfire, torpedoes, bombs, mines or other implements of war, or by stranding, sinking, burning or collision, provided such losses would not be covered by a marine insurance policy (in the form hereto attached) warranted free of claims arising from Capture, Seizure or Detention."

Construing such conglomerate provisions requires a skill not unlike that called for in the decipherment of obscure palimpsest texts. A judicial sigh recently uttered at the seat of Lloyd's evokes a sympathetic echo. "Freight insurance entered into on the old form of marine insurance policy with deletions or additions to adapt the form to the intended contract [has] almost invariably given rise to difficulties, and the present case [is] no exception." Mr. Justice Sellers in *Atlantic Maritime Co.* v. *Gibbon,* [1953] 1 All E. R. 893, 899.[2] One envies not merely the perceptiveness of Lord Mansfield in matters of commercial law but his genial means of informing himself. We cannot resort to the elastic procedure by which Mansfield sought enlightenment at dinners with "knowing and considerable merchants," [3] nor have we any Elder Brethren of Trinity House to help us. To be sure,

[2] "The truth is that [the] law of marine insurance is nothing more than a collection of rules for the construction of the ancient form of policy and such additions as are from time to time annexed to it. The ancient form dates back at least to the sixteenth century, and it is a document which the late Sir Frederick Pollock characterized, with justifiable asperity, as 'clumsy, imperfect, and obscure.' . . .

"Innumerable clauses have from time to time been devised to supplement the ancient form. Unhappily tradition seems to have caused them also in very many cases to be 'clumsy, imperfect, and obscure,' . . . . Oddly enough, the tradition has even infected the Legislature with a microbe of inaccuracy. In 1746 an Act . . . made re-insurance illegal, except in the case where 'the assurer shall be insolvent, become a bankrupt, or die.' It is inconceivable that an insolvent underwriter should desire to re-insure, and obviously the evil aimed at was double insurance by the assured. 'Re-insurance,' however, had then its present well known meaning, and the draftsman of the Act used the wrong word in order to maintain the tradition of obscurity." MacKinnon, L. J., in *Forestal Land, Timber and Railways Co.* v. *Rickards,* [1941] 1 K. B. 225, 246–247.

[3] *Lewis* v. *Rucker,* 2 Burr. 1167, 1168.

"Lord Mansfield converted an occasional into a regular institution, and trained a corps of jurors as a permanent liaison between law

we have in this case the benefit of the views of the most experienced of admiralty judges. Considering the scanty contact this Court has these days with maritime law, we pay especial deference to the weighty judgment before us. But since it is before us, we cannot abdicate the duty to decide and must in the end exercise our own judgment however unsure it be.

Assuming that the policy was in force when the *Portmar* was attacked, there is no doubt whatever that the underwriters would be liable for the damage under the basic adventures and perils clause taken alone. Cf. *Standard Oil Co.* v. *United States,* 267 U. S. 76. The capture and seizure warranty, on the other hand, would, of course, hold the underwriters free. We understand the war-risk rider to provide as follows: Risks which are covered by the adventures and perils clause, but which are excluded by the capture and seizure warranty, and only such risks, remain covered. These risks include, in the language of the adventures and perils clause, "Restraints and Detainments of all Kings, Princes and People," or, in that of the capture and seizure warranty, "restraint or detainment, or the consequences thereof . . . or any taking of the Vessel, by requisition or otherwise." [4]

and commerce. He won their confidence by social, as by professional, condescension, 'not only conversing freely with them in court, but inviting them to dine with him.' " Fifoot, Lord Mansfield, 105, quoting from 2 Campbell, Lives of Chief Justices, 407.

[4] The war-risk rider is not without its slight ambiguity. The word "only" in its first paragraph could be read to indicate that that paragraph simply sets the outer limit of the coverage but is not itself an insuring clause, that is, does not reinstate any of the coverage of the adventures and perils clause. We do not understand the underwriters to urge such a reading, and we do not think they could reasonably do so. Following its first paragraph, the rider insures against some risks not specifically mentioned in the adventures and perils clause, and also excludes from coverage certain detainments not connected with "actual or impending hostilities." If the first

The free of British capture warranty would, in turn, again very likely avoid liability in this case. But the war-risk rider makes the loss of the *Portmar* one which is "otherwise covered by this policy" within the terms of the saving clause in the British capture warranty. The loss is "otherwise covered by this policy" because it is insured against elsewhere within it, that is, in the war-risk rider. Since the *Portmar* had not been "condemned" when she was damaged by "implements of war," the saving clause thus reinstates, in this case, coverage avoided by the free of British capture warranty, still assuming, of course, that the policy was in force at the time of the loss.[5]

The underwriters contend that the phrase "losses otherwise covered by this policy" in the saving clause refers

---

paragraph of the rider is not to be read as an insuring clause, why is the subsequent insuring clause referred to in the rider as an "additional" one? What sense is there in singling out as risks to be insured against exclusively those risks which might be thought not to be clearly covered in the adventures and perils clause? Why should war-risk insurance, purchased at a time of impending war and covering "only against the risks of war, strikes, riots and civil commotions," insure comprehensively against the perils of civil war but not against those of war itself? Finally, why should insurance be written in language construing a non-operative clause?

[5] The final proviso in the saving clause—that the losses must be such as would not be covered by a policy in which the capture and seizure warranty is in full force—is automatically complied with once it is established that the loss in this case is "otherwise covered by this policy." For it is "otherwise covered" by virtue of the war-risk rider, which in turn covers only losses excluded by the capture and seizure warranty. These riders and warranties, which, when assembled, constitute the policy, are often independently developed. That may explain overlapping provisions such as these. Moreover, it is not hard to understand why extreme caution is exercised in making certain that only war risks are insured against by war-risk riders and saving clauses. For war-risk insurance is often—as it was in this case—written separately from ordinary marine insurance, and it is important to exclude losses, caused by collision or stranding, for example, which are attributable to the ordinary hazards of navigation.

to losses which the policy would cover if they were not the consequences of an Allied restraint or detainment. A loss such as that of the *Portmar*, they say, is not otherwise covered because it followed a deviation which, had it not occurred pursuant to naval orders, would not be excusable and would have terminated coverage. The phrase in its context precludes such sophistical reading. It is plainly intended, together with the proviso at the end restricting the clause to losses which the capture and seizure warranty would exclude and which the war-risk rider therefore takes in, to make certain and doubly certain that the coverage of the policy as a whole is in no event enlarged.[6]   Moreover, if the sense were given to the "otherwise covered" phrase which the underwriters press upon us, the saving clause as a whole would be left quite devoid of any meaning.   It would then uselessly preserve coverage only for losses which are securely covered anyway, despite the presence of the free of British capture warranty.

The underwriters resort to a second argument concerning the saving clause.   They contend, not quite consistently with the earlier argument, that the clause was meant to save losses which occur while a vessel is under certain Allied restraints, limited in number, but not under others.   The underwriters, upon the trial, offered to prove as much by an expert witness.   No more need be said than that to vary the terms of the saving clause so as to make it mean what the expert in the District Court said it meant [7]—which on its face it cannot mean—would be to reform the contract, and that the requirements of the equitable doctrine of reformation are not met in this case.

---

[6] See n. 5, *supra*.

[7] The witness, William D. Winter, chairman. of the board of a leading marine insurance company in the United States, manager, for a number of years, of the American Marine Insurance Syndicate,

We thus read the provisions of this policy as insuring against a loss such as that of the *Portmar,* though it be the consequence of seizure by a British ally.  So, reasoning substantially along these lines, did the District Court, and it proceeded to hold the underwriters liable.  The Court of Appeals assumed that the "labyrinth of verbiage, within which lurks whatever contract was made, is to be understood to agree that, although the ship might at the time be under the 'restraint of princes,' the policy should cover her loss . . . ."  But it held that "the policy

---

and a former president of the American Institute of Marine Underwriters, testified as follows:

"During the war . . . Great Britain and her Allies took vessels into control ports in order to see whether they had contraband . . . on them.  The ship at that point . . . was in the control of the Government authorities, or it was captured. . . .  [G]oing into those control ports, [was] a very dangerous operation . . . .

"The cases had been settled, that the underwriters were not liable. The underwriters didn't think that was doing their part of their job.  So they constructed . . . this clause to go on hull policies . . . to show that they were willing, notwithstanding the fact that this vessel had been captured, nevertheless, if in entering a control port she was blown up by a mine, or if she went ashore . . . they would not refuse the claim because of that happening.  It was to save the assured from something over which he had no control in a very limited situation, where the British Government had not captured it for the purpose of, at that point, condemning the boat because we say that if condemned, we were not liable, but for the purpose of finding out whether the boat, perhaps, should be condemned, and the underwriters felt that under those circumstances it was their duty to go ahead with their assured and take care of this unusual situation.  But it was always within the framework of that voyage, of that particular incident of the voyage.  The words are general, I agree . . . ."

The District Court heard this testimony subject to a later ruling on its admissibility, based on a finding that the language of the free of British capture warranty was or was not ambiguous.  The court found that the language was not, and ruled that Mr. Winter's testimony was inadmissible.

was no longer in force when the loss occurred, the insured voyage having before then come to an end and the policy with it." 197 F. 2d., at 796. The voyage had ended, the court said, because the dominion exercised over the *Portmar* by Allied authorities was complete, and was very probably intended to continue indefinitely. The policy, in turn, was no longer in force because it was written for a voyage and could not outlast it, any more than a voyage charter would. Precisely as frustration of the voyage would end the latter, so it releases an underwriter from further liability.

The facts from which the Court of Appeals deduced that the detainment of the *Portmar* was to be prolonged indefinitely are these. When the *Portmar* reached Sydney, the Japanese had a working naval command of the Pacific, and Australia was threatened with invasion. The need for shipping was dire, as the use made of the *Portmar* herself shows. Indeed, after she was damaged and beached, military authorities salved her and patched her up hastily. The United States eventually requisitioned title to her, and she was used till finally destroyed. An American colonel in charge of transportation in Australia when the *Portmar* was there testified at the trial to the serious shortage of shipping, which, he said, continued throughout the year 1942. But as late as January 19, when the *Portmar* was in Darwin, the owners learned from an agent of the United States Maritime Commission that she would load chrome ore late in February and could be expected in Philadelphia in April. Australia was not, of course, the only place where there was a dearth of shipping at the time, and there is nothing in the record to show that a colonel on the spot had the last word as to the future use of an ocean-going vessel; if there were, it would strain credulity. Two further points are to be noted. First, when the Army salved and used the *Portmar* after she was damaged, she was

no longer in any condition to make ocean voyages, and could not readily be returned to such a condition. And it was at that time that the United States formally requisitioned her—at that time for the first time. Second, there was testimony indicating that other vessels detained in Australia early in 1942 were held through the year. But there is no testimony that any vessels similar to the *Portmar* were so held. The witness—the Army colonel in charge—spoke of "[s]ome 21 small Dutch vessels."

In point of time, the Court of Appeals fixed frustration of the voyage as having taken place at Brisbane, during the period of January 5 to 9, 1942. And so the underwriters contend here. Part of the *Portmar's* cargo, which was unloaded at Brisbane for sorting, was, as we have seen, put back on her there, and she was sent with it to Darwin. It can hardly be maintained that the vessel's trips along the Australian coast after Brisbane, while she was still carrying parts of her original cargo, or the trip from Sydney to Brisbane, constituted a departure from her voyage, whether or not excusable. For the voyage specified in the *Portmar's* insurance policy was not to a single port as the outbound destination, but to a "port or ports" and back, "via port or ports in any order." [8] That being so, we cannot find that the voyage ended at Brisbane on the theory that it was there that dominion over the *Portmar* by requisitioning authorities became complete

[8] To be sure, going from Brisbane to Darwin instead of discharging all cargo at Sydney or Brisbane meant exposing the vessel to greater risk. The same may be said of returning to an Atlantic rather than a Pacific port in the United States. The policy permitted either. The underwriters could have avoided all these potential additional risks by writing a policy for a voyage from one specific port to another and back. They did not. Nor can the underwriters complain that in going from Brisbane to Darwin the *Portmar* hugged the coast, thus increasing her sailing time and, in one sense, again, the risk. For she did it for her safety, just as she justifiably turned south on the day Pearl Harbor was attacked.

and hence there that the intention to cause her to abandon her voyage was formed or manifested. It is not maintained, nor could it be, that an explicit decision, objectively provable, not to allow the *Portmar* to continue on her voyage was ever reached by the authorities, and there is no showing whatever that her owners or charterer had any intention of discontinuing the voyage. On the evidence, this is not a case in which a change of voyage, releasing the underwriters, can be shown before the vessel is overtly employed in a manner inconsistent with the purpose or route of the original voyage. Compare *Thellusson* v. *Ferguson*, 1 Doug. 361, with *Tasker* v. *Cunninghame*, 1 Bligh 87, and *Wooldridge* v. *Boydell*, 1 Doug. 16; see 1 Arnould, Marine Insurance (13th ed., by Lord Chorley 1950), §§ 381, 385. Consequently, dominion or no, the *Portmar* was covered by her insurance at Brisbane and later, till she started on the Koepang expedition, or just before, as she is conceded to have been covered before Brisbane, while under equally complete dominion of naval authorities. Cf. *Rickards* v. *Forestal Land, Timber and Railways Co.*, [1942] A. C. 50, 80.

The Koepang expedition was undoubtedly a venture inconsistent with the voyage specified in the *Portmar's* insurance.[9] We are prepared to assume, though

---

[9] It was a deviation, but it is worth noting that, in view precisely of the fact that the *Portmar* was under the complete and inescapable dominion of competent naval authorities, it was excusable, and hence not such a deviation as might, without more, release the underwriters from all further obligations. This would probably be true even had the *Portmar's* policy been warranted free of all war risks, in which case the Koepang trip would have been a deviation occasioned by a peril not insured against. Cf. *Robinson* v. *Marine Ins. Co.*, 2 Johns. (N. Y.) 89, and *Scott* v. *Thompson*, 1 Bos. & Pul. (N. R.) 181; see 1 Arnould, *supra*, § 435. But cf. *Aktiebolaget M. Bank* v. *American Merchant Marine Ins. Co.*, 241 N. Y. 197, 149 N. E. 830. Not unless the Koepang trip marked a permanent change of voyage, an abandonment of the original one, could it be said that the coverage of even such a policy had undoubtedly come to an end.

of course we do not decide, that the Koepang trip would have terminated, on grounds of abandonment of voyage, the coverage of a policy warranted free of war risks or of one warranted completely free of British capture, and that, under such a policy, had the *Portmar* subsequently sustained damage not attributable to war causes, cf., *e. g.,* *Standard Oil Co.* v. *United States,* 340 U. S. 54, there would have been no recovery. We assume that in those circumstances the Court of Appeals could have inferred as it did, on the basis of the Koepang venture and of the military situation, that the *Portmar* was to be retained indefinitely under requisition, and that her voyage was therefore over. But the point of this policy is that here the underwriters, by virtue of the saving clause, did insure against risks of British requisition. They insured, in other words, against consequences of a forced interruption of the voyage, which must necessarily throw into doubt the chances of completing the voyage as planned. Circumstances which may make out a change of voyage and cause termination of coverage under a policy warranted free of risks arising from seizure need not do so under one of insurance against such risks. In one as in the other, if they are both written for a voyage, there is an implied warranty that no different voyage will be undertaken. But it is a warranty which must be construed in light of the express provisions of the policy, and which may mean different things in different policies.

If, in the circumstances of this case, an owner who bought insurance against damage resulting from Allied requisition and one who bought a policy excluding such losses entirely stand on no different footing in respect of a sovereign's intention to retain their vessels indefinitely, they hardly stand on a different footing in any substantial respect. And the one received very little, if anything, more than the other. For inferences of permanence, as strong as those in this case, will surely be permissible from

most every requisition by a friendly sovereign for military uses. It is hard to imagine a military situation serious enough to lead a commander in the field to take it upon himself to requisition a friendly vessel, which is not sufficiently serious to make that requisition of presumptively indefinite, or at least uncertain, duration in his mind. Thus the difference between a policy containing a free of British capture warranty with a saving clause, such as we have in this case, and one without a like saving clause narrows down, under the holding of the Court of Appeals, to this: On the first policy, underwriters may be held liable for losses attributable to a small class of Allied restraints which are by their nature limited in duration, the most common example being detainment for inspection. On the second policy, underwriters may not be so held. This, of course, is exactly the result which would flow from the construction placed on the saving clause by the underwriters' expert witness,[10] a construction contrary to that assumed by the Court of Appeals to be the correct one. As to other restraints, the Court of Appeals would normally allow no recourse against the underwriters to either owner, the one who bought the first type of policy or the one who bought the second; to one on one theory, to the other on another; to one because he expressly agreed himself to bear all risks arising from Allied restraints, to the other despite the fact that he paid for insurance against such risks and could have had every expectation, on the face of the policy written for him, that he had effectively obtained it. Thus a significant part of the coverage of war-risk insurance, which is purchased separately, over and above ordinary insurance, and at great expense, would be rendered nugatory.

The provisions of the policy contain no time limitations on the detainments against which they insure. The

---

[10] See n. 7, *supra*.

District Court consequently, although recognizing that "[i]ndeed, that is broad coverage!", felt constrained to hold that coverage would extend throughout the period of a detainment, no matter what its nature, and past the time when the voyage insured for had definitely been frustrated. The court thus, in effect, read the implied warranty concerning changes of voyage as referring, in this policy, to voluntary changes of voyage only. *Rickards* v. *Forestal Land, Timber and Railways Co.*, [1942] A. C. 50, may support the position of the District Court.[11] It

[11] In the *Rickards* case, the House of Lords dealt with voyage policies on cargo, insuring against detainments. No free of British capture warranty was involved. Upon declaration of war with Germany in September 1939, the masters of the three vessels in question put into neutral ports and then, under orders of the German Government, of which they were subjects, proceeded to run the blockade and try to make German ports. This constituted abandonment of the voyages insured for. One of the vessels made a German port. The other two were intercepted and, again under orders from the German Government, scuttled by their masters to avoid capture. The House of Lords held that the abandonment of the voyages, occasioned by restraint of princes—*i. e.*, the orders of the German Government, which were binding on the masters—did not relieve the underwriters of liability. The underwriters here attempt to distinguish the *Rickards* case on the ground that it dealt with cargo rather than hull insurance, and on other grounds. We do not pass on the validity of these grounds of distinction. But the *Rickards* case does definitely dispose of an argument based on the following clause, which appeared in the *Rickards* policies and which is present in the policy before us now: "Warranted free of any claim based upon loss of or frustration of the insured voyage or adventure caused by arrests, restraints or detainments, of kings, princes, or peoples." It was urged in *Rickards* that this warranty means that whenever damage or loss resulting from a restraint frustrates the voyage, the underwriters are relieved of any liability arising from that restraint. It is hence unnecessary to decide whether or not frustration of the voyage before the damage occurred ended coverage. The simple answer to this argument was that the claim made was not "based upon loss of or frustration of the insured voyage"; it was based upon loss of the

is persuasive authority, since "[t]here are special reasons for keeping in harmony with the marine insurance laws of England, the great field of this business . . . ." *Queen Ins. Co.* v. *Globe Ins. Co.*, 263 U. S. 487, 493. But we are not required to accept the broad ground on which the District Court rested. It is not contended here that anything done by any officer or official on the scene or elsewhere before the *Portmar* was damaged made it explicit—and now objectively provable—that she would be detained indefinitely or even for such a period of time as might be thought to postpone her return voyage unreasonably. Such an explicit decision might at least more likely have come to the prompt attention of the owners, whereas in its absence, as here, no owner, whether on the scene or not, could so much as make an informed guess concerning the fate of the voyage. We do not decide that case, but we do hold that if a policy such as this is to provide any appreciable and safely predictable protection over and above that of a policy which does not insure at all against consequences of Allied detainments, coverage cannot be said to have ended before an unambiguous, objectively provable decision has been made by the requisitioning sovereign to cause abandonment of the voyage.

A number of subsidiary questions in the case were all decided in favor of the owners by the District Court.

---

cargo, as in this case it is based upon loss of the vessel. Of course, whenever as a consequence of a restraint a vessel or cargo is lost, or even severely damaged, the voyage is frustrated. If the frustration warranty applies in such cases, therefore, its effect is to hold the underwriters free of liability for any total loss, indeed, for most losses, resulting from detainment. We are authoritatively told that the clause was not intended to achieve such a sweeping result. See the observations of Viscount Maugham, [1942] A. C., at 72–73, of Lord Porter, *id.,* at 106, and of MacKinnon, L. J., [1941] 1 K. B., at 252.

The most important is raised by the contention that the vessel was never a constructive total loss and was not validly abandoned as such. The Court of Appeals, in view of its disposition of the case, found it unnecessary to consider any of these questions. They are not related to the major issue in the case, and so we remit them to the Court of Appeals.

The judgment of the Court of Appeals must be vacated and the cause remanded to that court for proceedings not inconsistent with this opinion.

*It is so ordered.*

MR. JUSTICE MINTON dissents for the reasons stated in the opinion of Circuit Judge Learned Hand, 197 F. 2d 795.

MR. JUSTICE DOUGLAS, with whom THE CHIEF JUSTICE concurs, dissenting.

THE CHIEF JUSTICE and I, having voted to grant certiorari in this case, would now dismiss it as having been improvidently granted. No principle of law, requiring restatement or clarification,* is involved. We have here only a question whether under the special circumstances of this case there was a frustration of the venture by the seizure of the vessel at Brisbane or at some later point. The District Court found there was not. The Court of Appeals, speaking unanimously through Judge Learned Hand, found that there was. The decision turns on the weighing of many factors and conditions against a background of admiralty practice and custom with which we are nowhere near as familiar as the experienced admiralty judges below. It seems to me quite improvident for us to reweigh the fragments of the evidence which Learned

---

*There is, for example, no usurpation of the fact finding function such as we commonly find in cases arising under the Federal Employers' Liability Act. See *Wilkerson* v. *McCarthy,* 336 U. S. 53.

Hand, Augustus N. Hand, and Harrie B. Chase, JJ., weighed (see 197 F. 2d 795, 799–801) and to revise the decision which their experienced minds reached on the totality of the facts of the case. Yet if we were to do so we could not escape the conclusion that the voyage had been frustrated at least by the time the *Portmar* reached Darwin on February 12, 1942. For as the opinion of the Court concedes, by that time the vessel had been emptied of her original cargo and was being loaded with troops, equipment, and armament for "an exceedingly perilous expedition to Koepang, on the Island of Timor, some 500-odd miles northwest of Darwin." As the Court says:

> "This expedition ran into heavy air attacks and turned back. On the 18th of February, the *Portmar* was at Darwin again, awaiting her turn to dock and discharge the personnel and equipment she had taken on. While thus at anchor on the morning of the 19th, she underwent bombing and strafing by Japanese airplanes and sustained the damage which forced her master to beach her and caused him to abandon her."

Certainly by the 12th of February the purposes of the venture, commercially speaking, had ended. The ship was now engaged in an enterprise far beyond the voyage contemplated by the parties.